UNITED STATES of America

v.

Denis M. NEILL, James P. Neill, Defendants.

Crim. Action No. 95–0323 (JHG).

United States District Court, District of Columbia.

Jan. 17, 1997.

John Martin Bray and Joseph Martin Jones, Schwalb, Donnenfeld, Bray & Silbert, P.C., Washington, DC, for Denis M. Neill.

Charles Taylor Smith, II, Ober, Kaler, Grimes & Shriver, Baltimore, MD, Martha Purcell Rogers and Hartman E. Blanchard, Ober, Kaler, Grimes & Shriver, Washington, DC, for James P. Neill.

Richard A. Poole, U.S. Department of Justice, Criminal Division, Fraud Section and John E. Sullivan, U.S. Department of Justice, Criminal Section, Tax Division, Washington, DC, for the U.S.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Pending before the Court is the defendants' Motion to Dismiss due to the Government's Invasion of Their Attorney–Client Privilege ("Motion to Dismiss"). After determining that the defendants had made the requisite preliminary showing under *United States v. Kelly*, 790 F.2d 130, 137 (D.C.Cir. 1986), the Court ordered an evidentiary hearing on this issue. *See United States v. Neill*, Memorandum Op. at 21 & 24 (JHG) (D.D.C. Oct. 10, 1996). Upon consideration of the evidence introduced and testimony offered at the evidentiary hearing, in light of the credibility and demeanor of the witnesses, as well as the *in camera* submissions offered by both parties,[1] their post-hearing briefs and the entire record in this matter, the Motion to Dismiss will be denied.

### I. Findings of Fact

On October 27, 1993, federal agents executed four search warrants at the office of Neill and Company, and the homes of Defendants James and Denis Neill. On October 28th, a fifth warrant was executed to search Defendant James Neill's safe deposit box at Columbia First Bank in Washington, D.C. *See* Mem.Op. at 1–5. Approximately sixty boxes of materials were seized, including computers, computer files and data. *Id.* at 6. The seized items were stored in a locked space at the IRS Office, 500 N. Capitol St., N.E., Washington, D.C.

While the affidavits to the search warrants and the search execution memorandum stated that the federal agents were not to seize documents on the letterhead of the defendants' attorneys, these "letterhead documents" were in fact seized over the oral and written objections of the defendants.[2] The agents also seized other documents that were not "letterhead documents" but some of which were later claimed to be protected by attorney-client privilege.[3]

In that the search warrants authorized the search of a law office as well as the home of

---

1. While the Court has considered the *in camera* submissions of the parties (filed under seal), the Court has taken care not to disclose the specific contents of those submissions in this Memorandum Opinion.

2. The Fourth Amendment issues stemming from the search have been resolved and are not presently before the Court.

3. Two categories of potentially privileged documents have been discussed in the course of litigating this motion: (1) communications between the defendants and their counsel, which in the context of this criminal proceeding have constitutional significance; and (2) communications between Denis Neill, as a lawyer, and his clients (including Kamel Fattah), which while such communications may be privileged, they have no constitutional significance here.

Denis Neill, a lawyer, the government provided measures to minimize the potential intrusion upon the attorney-client privilege. FBI agent attorneys were directed to serve as Principal Legal Advisers ("PLA's") on site to review all potentially privileged documents prior to seizure. *See* Mem.Op. at 6 (quoting Search Execution Memorandum of Oct. 19, 1993). The Search Execution Memorandum provided that "search team members, with the advice of PLA's as appropriate, should segregate and place in sealed envelopes or separate boxes, items that may be subject to the attorney-client privilege. This includes any items which occupants of the search locations claim are privileged." *Id.* (quoting Search Execution Mem. at 2).

The seizure of potentially privileged documents was handled differently at different search sites. At Denis Neill's home, after offering Denis Neill's counsel the option of sealing the materials for off-site review or of having the PLA conduct an immediate on-site review in counsel's presence, counsel (over standing objection) selected the latter. The PLA then reviewed each document for which counsel claimed privilege, seizing some and returning others to counsel. At the offices of Neill & Company, without reviewing the potentially privileged materials in James Neill's seized briefcase, the PLA sealed those materials. At no time did the defendants' counsel seek judicial intervention or file a motion for a protective order. Nor did counsel ever file a motion under Fed. R.Crim.P. 41(e).

Because materials asserted to be subject to the attorney-client privilege had been seized, on October 28th, Deputy Chief of the Fraud Section Peter Clark directed trial attorney Elisabethanne Stevens and her supervisor, Barbara Corprew, to review those materials. Stevens and Corprew formed what the Department of Justice called a "taint team," meaning that their actions would be "walled off" from the prosecution team thereby ensuring that the prosecution team remained free of the "taint" arising from exposure to potentially privileged material. Stevens and Corprew's mandate was to review documents for which the defendants claimed attorney-client privilege, determine whether the crime-fraud exception might be applicable, and, if necessary, litigate the existence of the privilege or the application of the crime-fraud exception.[4] On October 29th, before he met with the defendants' counsel, prosecutor Richard Poole (Senior Trial Attorney, Fraud Section) was advised that Ms. Stevens would act in this capacity.

On November 1, 1993, the defendants' counsel met with Poole to voice their objections to the seizure of materials for which they claimed privilege and to demand the return of the same.[5] While the defendants' counsel contend that the government promised to return without review any documents seized contrary to the search affidavits and Search Execution Memorandum, Poole recalled telling counsel that such documents would be returned, but only after review by someone other than a "prosecution team" member: "We discussed the fact that the fraud section had identified a review team who would be looking at the issues raised by the claims of privilege and would—would be responsible for resolving them, including litigation." Hearing Transcript ("Transcript") at 74 (Vol. I–B).[6]

In a follow-up letter, the defendants' counsel requested the return of thirteen items, none of which they claimed were privileged but which were of a personal nature to the defendants or their family. *See* Joseph

---

4. No litigation directly resulted from the taint team's review because the defendants never filed any motions for a protective order or under Rule 41(e) and because the government never contested the applicability of the attorney-client privilege or raised the crime-fraud exception.

5. IRS Special Agent Sherry Brown also attended the meeting. Her contemporaneous notes were introduced into evidence at the evidentiary hearing. *See* Defendants' Exhibit # 7.

6. Poole further testified that he "told them that the prosecution team would not review any of the documents as to which claims of privilege had been raised until those questions were resolved." Transcript at 75 (Vol. I–B). While it is possible, as the defendants contend, that as of the November 1, 1993, meeting, the prosecutor intended to return the letterhead documents without review, whether he did so intend but later changed his mind is not relevant to disposition of the instant motion.

Jones' letter of Nov. 4, 1993, at 1–2, Defendants' Exhibit ("DE") # 5. The letter also stated:

> With regard to the privileged items, we propose to designate someone from our office to immediately review these items with Attorney Elisabeth (sic) Stevens of your office in order to segregate those items which were clearly seized in contravention of your instructions to seize no correspondence, memoranda, etc., emanating from our offices or those of James Neill's counsel, Martha P. Rogers, Esq. There may be other materials which are privileged communications between Denis or James Neill as clients, and others (sic) attorneys." *Id.* at 2.[7]

On November 2nd, Stevens received two boxes which included materials that the defendants claimed were protected by the attorney-client privilege. While Defendant Denis Neill's counsel did not designate anyone pursuant to his letter of November 4th until approximately one month later, Stevens was contacted directly by Defendant James Neill's counsel, Martha Rogers, on November 3, 1993. Rogers demanded the return of the materials in James Neill's briefcase. She testified that she was advised by Stevens that such materials would be returned without review as soon as they were located. However, Stevens testified that on or about November 8th, she advised Rogers that she would be reviewing those documents before she could make a determination whether they should be returned. Still, the defendants made no request for judicial intervention.

During the course of the next several months, Stevens and Corprew reviewed the initial delivery of potentially privileged materials as well as other potentially privileged documents later discovered among the seized items. In two instances, IRS Special Agent Fort, a member of the prosecution team, discovered documents that were marked "attorney-client" privilege among the seized items.[8] Fort testified that, on or about December 1, 1993, after one of the defendants' counsel had reviewed the seized materials and made an inventory, *see* Transcript at 83 & 104 (Vol. I–B), he began reviewing the materials. While going through a three-ring binder, he happened upon a tab that was labeled "Earl Glock–Attorney/Client." After opening the notebook to the tab, he discovered what appeared to him to be a legal opinion. He then removed that section, without reading the potentially privileged material, sealed the document and delivered it to Stevens. *See* Transcript at 80–86 (Vol. I–B). Agent Brown, who was present when Fort discovered and sealed the document,[9] corroborated Fort's testimony. *See* Transcript at 84–85 (Vol. II–B). Fort testified persuasively that he neither showed the document to Poole nor did he discuss what he may have gleaned of its content or even the fact of its existence. *See* Transcript at 86 (Vol. I–B). The document was later returned to the defendants by Stevens.

Another set of potentially privileged materials was discovered by Fort on or about January 24, 1994. Fort testified that while again reviewing documents that had already been inspected and inventoried by defense counsel, he opened a manila envelope for Federal City National Bank which included documents that were labeled as "attorney/client privileged." *See* Transcript at 87 (Vol. I–B). Fort testified that he did not

---

7. This letter does not appear to be the "smoking gun" that the government contends. While it could be construed, as the government argues, to reflect defense counsel's acknowledgment that *all* potentially privileged materials would be reviewed, it can also be reasonably construed to reflect counsel's understanding that he was to designate someone to assist in the segregation of "letterhead" documents from other materials so that the former could be returned without review by the government. Nevertheless, it is unnecessary to resolve this dispute in order to resolve the instant motion.

8. The defendants also challenge Fort's presence during the search of the office of Neill and Company on October 27, 1993. However, Fort denied reviewing any documents during the search or discussing the contents of any documents with the seizing agents, *see* Transcript at 80–81 (Vol. I–B), and the defendants have offered no evidence to the contrary.

9. Agent Brown testified that Fort wanted her to witness that, upon finding the potentially privileged materials, he sealed them immediately and did not read them. Transcript at 84 (Vol. II–B).

show the documents to anyone or read them. *See id.* at 87–88 & 101. Instead, he immediately sealed them and then gave the sealed materials to Brown, who delivered them to Stevens. *See* Transcript at 101 (Vol. I–B); Transcript at 84–86 (Vol. II–B).

Eventually, all of the documents for which the defendants asserted attorney-client privilege were returned to their counsel. It is undisputed that Stevens and Corprew read those materials. However, neither the evidence at the hearing nor the *in camera* submission of over two boxes of electronic mail messages and other documents indicate that any privileged information flowed from the taint team to the prosecution team. Instead, the record and *in camera* materials reflect that Stevens and Corprew clearly appreciated the need for isolating their review from the prosecution and took steps on numerous occasions to ensure that the substantive information in potentially privileged documents was protected. Only those materials for which attorney-client privilege was not asserted were released to the prosecution team, and the record demonstrates that this was done only after the defendants were provided notice and an opportunity to claim privilege.

In the course of their assignment, Stevens and Corprew did not review the potentially privileged data that was stored electronically. Unlike the letterhead documents and other materials that were seized, however, there is no evidence demonstrating that the defendants ever asserted a claim of attorney-client privilege with respect to the computer material. *See, e.g.,* Transcript at 107–08 (Vol. II–B). Nevertheless, in May and June of 1996, the government established a computer "taint team." It assigned Agent Ray Smith to download the files and Agent Harvey Barlow to review them for materials that were potentially privileged. *See* Government's Supplemental Submission Regarding Issues Arising from the Search Warrants, at App. 2. Potentially privileged materials were deleted from the files prior to providing the prosecution team with computer disks containing the seized electronic files. While it is undisputed that the prosecution team had access to the computers and electronic files, the agents testified persuasively that they did not access those files, and there is no evidence to the contrary. Significantly, two prosecution team members testified at the hearing that they lacked computer skills. *See* Transcript at 77 (Vol. II–B); Transcript at 8 (Vol. II–A).

## II. Conclusions of Law

A criminal defendant is guaranteed the right to the effective assistance of counsel. *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970); *Coplon v. United States,* 191 F.2d 749, 757 (D.C.Cir.1951), *cert. denied,* 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 690 (1952). The attorney-client privilege, while it has not been elevated to the level of a constitutional right, *see, e.g., United States v. White,* 970 F.2d 328, 336 (7th Cir.1992), is key to the constitutional guarantees of the right to effective assistance of counsel and a fair trial. *Coplon,* 191 F.2d at 757. To provide effective assistance, a lawyer must be able to communicate freely without fear that his or her advice and legal strategy will be seized and used against the client in a criminal proceeding. *See United States v. Levy,* 577 F.2d 200, 209 (3rd Cir.1978); *United States v. Rosner,* 485 F.2d 1213, 1224 (2nd Cir. 1973), *cert. denied,* 417 U.S. 950, 94 S.Ct. 3080, 41 L.Ed.2d 672 (1974). One of the principal purposes of the attorney-client privilege is to promote the free and open exchange between the attorney and client, *see Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976), and substantial questions of fundamental fairness are raised where, in connection with a criminal prosecution, the government invades that privilege. It matters little whether the intrusion occurred prior to the initiation of formal adversary proceedings, *see Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972), because the right to a fair trial could be crippled by government interference with the attorney-client privilege long before the formal commencement of a criminal proceeding.

"An independent judiciary and a sacrosanct confidential relationship between lawyer and client are the bastions of an ordered liberty." Edna Selan Epstein, *The Attorney–Client Privilege and the Work–*

*Product Doctrine* 2 (3rd ed. 1997). Nonetheless, not every intrusion on the attorney-client privilege constitutes a constitutional violation. Under *Weatherford v. Bursey,* 429 U.S. 545, 554, 97 S.Ct. 837, 843, 51 L.Ed.2d 30 (1977), an intrusion may result in a constitutional violation if privileged information is intentionally obtained and used to the defendant's detriment at trial. Where government agents acquire privileged information, but do not communicate that information to the prosecutors, there is no Sixth Amendment violation. *Id.* at 555, 97 S.Ct. at 843–44; *see United States v. Kelly,* 790 F.2d 130, 137 (D.C.Cir.1986). While there is a presumption that the information is conveyed to the prosecution team, *Briggs v. Goodwin,* 698 F.2d 486, 495 (D.C.Cir.1983), *vacated on other grounds,* 712 F.2d 1444, *cert. denied,* 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984), the government may rebut that presumption by showing the existence of suitable safeguards, *id.* at 495 n. 29, or by demonstrating that "there will be no prejudice to the defendants as a result of these communications." *United States v. Mastroianni,* 749 F.2d 900, 908 (1st Cir.1984). *See generally* Note, *Government Intrusions into the Defense Camp: Undermining the Right to Counsel,* 97 Harv.L.Rev. 1143, 1150 (1984).

■ Under *Weatherford* and *Kelly,* four factors are relevant as to whether an alleged intrusion into the attorney-client privilege offends the Constitution: (1) whether evidence to be used at trial was obtained directly or indirectly by the government intrusion; (2) whether the intrusion was intentional; (3) whether the prosecution received otherwise confidential information about trial preparation or defense strategy as a result of the intrusion; and (4) whether the privileged information was used or will be used to the substantial detriment of the defendants. *Weatherford,* 429 U.S. at 558, 97 S.Ct. at 845; *Kelly,* 790 F.2d at 137. While neither the Supreme Court nor this Circuit have yet explained how these factors are to be weighed, and the other circuits remain split, *see Kelly,* 790 F.2d at 137 & n. 5, it is clear that there must a substantial demonstration of prejudice before an indictment can be dismissed. *See United States v. Morrison,* 449 U.S. 361, 365, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981).

In this case, there can be no doubt that the government intentionally invaded the attorney-client privilege. The government all but concedes that materials subject to the privilege were reviewed during the execution of the search warrant and more were seized and sealed.[10] Stevens, an attorney assigned to the Department of Justice's Fraud Section, testified that she read most (but not all) of the potentially privileged materials to determine whether the crime-fraud exception applied. Moreover, at least one agent, PLA Rebecca Granger, read materials for which Defendant Denis Neill's counsel asserted privilege during the search of Denis Neill's home.[11] These intrusions were not accidental; they were deliberate and intentional.[12]

■ While the parties dispute whether courts have sanctioned the Department of Justice's "taint team" procedures,[13] it is clear that the government's affirmative decision to

---

**10.** The government consistently contended at the hearing that the materials were only "potentially" privileged. However, the decisions by the taint team to return to the defendants those documents for which the defendants asserted privilege, and to release to the prosecution team only those for which the defendants did not claim privilege, does more than imply concession.

**11.** Neither side called Agent Granger to testify at the evidentiary hearing.

**12.** On the other hand, the discoveries by Agent Fort are most fairly characterized as inadvertent since he happened upon potentially privileged materials <u>after</u> defense counsel had reviewed the boxes containing seized material. Fort testified that he was surprised to find this material because, in fact, defense counsel and support staff had already inspected and inventoried the materials.

**13.** Although the more traditional approach is to submit contested materials for *in camera* review by a neutral and detached magistrate (for obvious reasons), the case law regarding the government's "taint team" approach is equivocal. *Compare In re Search Warrant for Law Offices,* 153 F.R.D. 55 (S.D.N.Y.1994) (criticizing "walling" in review of disputed attorney-client materials) *with United States v. Noriega,* 764 F.Supp. 1480 (S.D.Fla.1991) (finding no Sixth Amendment violation where the government agent reviewing monitored attorney-client conversations was "walled off" from prosecutors).

invoke these procedures constitutes a *per se* intentional intrusion. *See Weatherford*, 429 U.S. at 558, 97 S.Ct. at 845; *Kelly*, 790 F.2d at 137.[14] Where the government chooses to take matters into its own hands rather than using the more traditional alternatives of submitting disputed documents under seal for *in camera* review by a neutral and detached magistrate or by court-appointed special masters, *see, e.g., United States v. Zolin*, 491 U.S. 554, 570–71, 109 S.Ct. 2619, 2629–30, 105 L.Ed.2d 469 (1989); *In re Grand Jury Proceedings*, 867 F.2d 539, 540 (9th Cir. 1989); *In re Impounded Case*, 840 F.2d 196, 202 (3rd Cir.1988); *In re Berkley and Company*, 629 F.2d 548, 550 (8th Cir.1980); *United States v. Osborn*, 561 F.2d 1334, 1338–39 (9th Cir.1977); *In re Subpoena Addressed to Murphy*, 560 F.2d 326, 331 (8th Cir.1977); *Hartford Assocs. v. United States*, 792 F.Supp. 358, 367 (D.N.J.1992), it bears the burden to rebut the presumption that tainted material was provided to the prosecution team. *Briggs*, 698 F.2d at 495 n. 29 ("The government is, of course, free to rebut this presumption, by showing, for example, procedures in place to prevent such intragovernmental communications.").

■■ However, an intrusion into the attorney-client privilege, standing alone, does not *per se* violate the Constitution. If the government demonstrates that no harm, that is, no privileged information regarding trial strategy or otherwise has been communicated to the prosecutors and used to the defendants' detriment, there is no constitutional violation. *Weatherford*, 429 U.S. at 558, 97 S.Ct. at 845; *Kelly*, 790 F.2d at 137. In this instance, based upon the evidence and testimony offered at the evidentiary hearing, including the demeanor and credibility of the witnesses as well as the Court's review of voluminous materials submitted under seal for *in camera* inspection and the entire record in this matter, the Court is satisfied that

the government has carried its burden to rebut the presumption of harm.

First, the government took precautions to shield the prosecution team from viewing potentially privileged materials during the execution of the search warrants. Only Agent Fort was present during the searches and then only for a short time. Fort testified persuasively that he did not read the content of any potentially privileged materials, and his testimony was not undermined on cross-examination or through other evidence. Second, the prosecution team witnesses testified that, to their knowledge, they received no privileged information from the agents who may have been exposed to potentially privileged materials, such as Agent Granger, the PLA on site during the search of Defendant Denis Neill's home. Finally, the taint team took sufficient precautions to ensure that the prosecution team did not have access to the potentially privileged documents or become aware of the content of those materials. When potentially privileged materials were later inadvertently discovered among the sixty boxes of seized items by Agent Fort, a prosecution team member, he acted responsibly by sealing the materials without reading them. He then had them delivered to the taint team for review.

The defendants contended at the evidentiary hearing (generally through bench conferences the transcripts of which have been sealed) that the government acquired information that will be used to their detriment. However, based on the Court's independent review of the defendants' sealed filing for *in camera* review (and contrary to the defendants' assertion), there is no evidence that the government acquired the defendants' trial theories or strategy. *Compare Levy*, 577 F.2d at 210 ("actual disclosure of defense strategy").

■■■ At most, the potentially privileged materials reviewed by the government contained facts identifying entities and per-

**14.** This decision is troubling indeed, and there is no doubt that, at the very least, the "taint team" procedures create an appearance of unfairness. However unwise this policy decision may be, absent a showing of harm, it does not offend the Constitution. While this Court is critical of the government's use of the "taint team" procedure,

that criticism is not intended to carry over to the individual attorneys who were assigned to perform as part of the taint team. The record reflects that these attorneys appreciated the sensitivity of their assignments and took affirmative measures to ensure that no breach of the "walls" actually occurred.

sons. *Cf. Upjohn Co. v. United States,* 449 U.S. 383, 395–96, 101 S.Ct. 677, 685–86, 66 L.Ed.2d 584 (1981) (distinguishing between protection provided to attorney-client communications and facts underlying those communications). While factual disclosures enabling the government to better investigate its case could rise to the level of a Sixth Amendment violation if substantial, *see United States v. Castor,* 937 F.2d 293, 297 (7th Cir.1991), the disclosure of facts is presumptively less harmful than the disclosure of trial strategy. Here the government has demonstrated to the Court's satisfaction that no privileged information, factual or otherwise, flowed from the taint team to the prosecution team. Consequently, there is no evidence of a harmful disclosure resulting from the taint team's review. The only information that the prosecution team may possibly have acquired arose from Agent Fort's inadvertent discovery of Earl Glock's identity. After the defendants' counsel reviewed the materials, Fort discovered the notebook with a tab marked "Earl Glock/Attorney–Client." [15] The inadvertent disclosure of this fact does not constitute constitutional harm.

In sum, the Court has not seen any potentially privileged materials that were seized and presumably [16] reviewed by the government and which can reasonably be construed as trial strategy. While some factual information was reviewed by the taint team, the record in this matter, including the *in camera* submissions, indicates that none flowed to the prosecution team. Agent Fort's discovery of the tab identifying "Earl Glock/Attorney–Client" can only be characterized as inadvertent. The defendants' argument that the government derived its factual knowledge from material protected by the attorney-client privilege is based on bare speculation, and, for the reasons stated above, it is rejected.

 As to the computer files, the defendants' charge fails at the outset simply because they have not shown that they asserted the attorney-client privilege with respect to those materials. The proponent of the privilege bears the burden to establish its existence, *United States v. (Under Seal),* 748 F.2d 871, 876 (4th Cir.1984); *United States v. Covington & Burling,* 430 F.Supp. 1117, 1122 (D.D.C.1977), and absent the timely assertion of attorney-client privilege for each specific communication or document, no privilege will be recognized. *United States v. White,* 970 F.2d 328, 334 (7th Cir.1992). Since there is no evidence of such an assertion by the defendants, it is unsurprising that neither Stevens nor Corprew were asked to review computer files. Indeed, Stevens testified that she was unaware of the existence of these files. Nonetheless, even though there was no claim of attorney-client privilege, the government did implement a computer taint team to review files on computer disks.[17] Absent the timely assertion of privilege, the defendants cannot now complain.

### III. Defendant's Motion to Supplement the Record

Over a month after the conclusion of the evidentiary hearing, the defendants filed a motion to Compel Production and to Supplement the Record of the November 4–5, 1996 Evidentiary Hearing ("Motion to Supplement the Record"). At the hearing, the Court consistently denied the defendants' request

---

**15.** In cross-examining the prosecution team members at the evidentiary hearing, the defendants contended that the government acquired factual information identifying certain persons and business entities. However, with the exception of Earl Glock (who was identified in a document discovered inadvertently), the government witnesses persuasively testified that those entities were known to the investigators prior to the search. This testimony was not surprising. The investigation of the Neills and their business activities dates to at least 1991, and the abundant record in this matter indicates that the scope of the investigation (even prior to the searches of October 27, 1993) was wide ranging indeed.

**16.** As noted previously, Stevens returned certain documents without review based upon Roger's representations on or about November 15, 1993.

**17.** The testimony at the hearing indicated that some of the files were printed and read by at least Agent Fort prior to the computer taint team's review. Nevertheless, even though the defendants knew that the government had seized the electronic data and equipment, they have not demonstrated that they asserted their attorney-client privilege with respect to any material stored electronically.

that the government be required to produce to the defendants copies of the government's internal memoranda, electronic mail and other materials which would reveal the government's deliberations. However, in response to the defendants' repeated requests, the Court eventually ordered the government to produce certain internal documents for *in camera* review. The government did so, to the tune of two very full boxes of materials which document the taint team's actions and trace internal Department of Justice communications to and from Stevens and Corprew.[18] The Court is not persuaded that additional disclosures are justified or that supplementation would be helpful to resolving the Motion to Dismiss.

■ The defendants support their motion by arguing fairness and noting specifically that the Court granted the government's request to supplement the record with a memorandum from Michael Shaheen of the Department of Justice's Office of Professional Responsibility. *See* Order of December 9, 1996. The Shaheen memorandum simply reflects his finding that the Fraud Section engaged in no misconduct.[19] While the defendants did not object to the government's motion to file the Shaheen memorandum, the Court notes that this document was already available to her as part of Ms. Corprew's files, which were submitted for *in camera* review based upon the defendants' request at the evidentiary hearing. By granting the government's unopposed motion, the Court merely ensured that the Shaheen memorandum was also available to the defendants. The Court's Order of December 9th simply establishes no equitable ground upon which to grant the Motion to Supplement the Record.

In sum, the parties were provided a sufficient opportunity to develop the evidentiary record, and the defendants' request for disclosure of additional materials will be denied.

## IV. Conclusion

Accordingly, it is hereby

**ORDERED** that the defendants' Motion to Dismiss is denied; and it is

**FURTHER ORDERED** that the defendants' Motion to Supplement the Record is denied.

IT IS SO ORDERED.

---

18. The communications were not limited to those between Stevens and Corprew.

19. While interesting, Mr. Shaheen's ethics determination for departmental employees bears little, if any, relevance to the constitutional analysis under *Weatherford* and *Kelly*.