UNITED STATES of America,

v.

Maria HSIA, Defendant.

No. Crim. 98–0057 PLF.

United States District Court,
District of Columbia.

Jan. 4, 2000.

Eric L. Yaffe, John M. McEnany, Dabney Langhorne, Public Integrity Section, Campaign Task Force, Criminal Division, U.S. Dept. of Justice, Washington, DC, for U.S.

Nancy Luque, Andrew L. Hurst, Rangely Wallace, Reed Smith Shaw & McClay, Washington, DC, for Maria Hsia.

## OPINION AND ORDER

PAUL L. FRIEDMAN, District Judge.

This matter is before the Court on motion of the defendant, Maria Hsia, to dismiss the indictment on the ground that it is tainted. Defendant argues that the government has obtained and used information protected by the attorney-client and joint defense privileges in violation of her rights. Specifically, Ms. Hsia alleges that her former counsel, Brian A. Sun and his colleagues at the firm of O'Neill, Lysaght & Sun, in negotiating for immunity for certain of their other clients, shared privileged information with the government. Ms. Hsia suggests that such information, which was communicated directly to Sun when he represented her or through her subsequently retained attorney, Gordon A. Greenberg of the firm of Sheppard, Mullin, Richter & Hampton, was provided as part of a joint defense agreement ("JDA"). Ms. Hsia maintains that the government acquired and used this information with the knowledge that a JDA existed.

Defendant argues that the government's use of her confidential, privileged attorney-client communications have tainted the indictment, the bill of particulars and this entire prosecution, thereby depriving her of her Fifth and Sixth Amendment rights to due process and to counsel. Defendant urges the Court to remedy or neutralize the taint by dismissing the indictment under at least one of three separate legal theories: because the government knowingly intruded into her attorney-client privilege, because the government engaged in outrageous conduct, and/or because clear injustices that otherwise cannot be remedied must be addressed under the Court's inherent supervisory powers. Alternatively, the defendant argues that the prosecutors should be disqualified. The facts, however, simply do not support defendant's allegations. She has failed to provide sufficient evidence under any of these theories that would lead the Court to believe that it should take any action whatsoever, let alone dismiss the indictment.

## I.  BACKGROUND

The Court convened an evidentiary hearing on the defendant's motion and took testimony on November 24, 1999 and December 22, 1999. It heard the testimony of the defendant Maria Hsia; Brian A. Sun and Frederick Friedman, partners in the law firm of O'Neill, Lysaght & Sun; Stacy Cohen, a former legal assistant at the same firm; James D. Robinson, a former attorney for Maria Hsia & Associates and the Hsi Lai Temple; Eric L. Yaffe, the lead prosecutor in this case; and Nancy Luque, lead defense counsel for Ms. Hsia. It also considered two affidavits, one of them submitted under seal, from defendant's former attorney Gordon A. Greenberg, formerly a partner at Sheppard, Mullin, Richter & Hampton, and portions of the grand jury testimony of Stacy Cohen and Venerable Yi Chu, submitted by the government under seal. Finally, it considered two *ex parte* affidavits submitted by the defendant, one of which purports to identify portions of the indictment and the bill of particulars which, according to the defendant, rely exclusively on privileged information that could only have come from information she provided to others involved in the JDA and which

therefore must have been passed to the government without her permission.

The Court attempted to take as much of the testimony as possible in open court but excused the government and the public from portions of the hearing at which privileged information was likely to be elicited. In doing so, it considered the objections to public proceedings lodged by the defendant through her current counsel and by various intervenors who appeared through counsel—namely the International Buddhist Progress Society (also known as the Hsi Lai Temple) and three of the monastics associated with the Temple: Venerable Abbess Tzu Jung, Venerable Man Ho Shih and Venerable Yi Chu. The portions of the hearing that were non-public were closed over the objection of the government, which maintained both that there was no legal authority to close such a hearing and that it was unfair to require it to defend against a motion to dismiss an indictment on grounds of prosecutorial misconduct if it were not permitted to hear the specific charges and the testimony that allegedly supported them.

The Court attempted to balance the legitimate interests of the government and the public in being present for the entirety of such an important proceeding against the interests of the defendant and the intervenors in preserving privileged information from further disclosure and the potential argument that any such disclosure, even when ordered by a court in connection with a judicial proceeding, could constitute a waiver of the privilege. *See In re Sealed Case,* 877 F.2d 976, 980 (D.C.Cir.1989). The Court is convinced that there is ample authority for conducting these proceedings partially behind closed doors in the circumstances presented by this unusual motion. *See Halkin v. Helms,* 598 F.2d 1, 5 (D.C.Cir.1978) ("It is settled that *in camera* proceedings are an appropriate means to resolve disputed issues of privilege."); *United States v. Smith,* 123 F.3d 140, 151 (3rd Cir.1997); *United States v. Neill,* 952 F.Supp. 834

(D.D.C.1997). Furthermore, while the Court has considered testimony received *ex parte* and *in camera* and has accepted several submissions under seal, the Court has taken care not to disclose the specific contents of the *ex parte* testimony or the sealed submissions in this Opinion and Order.

## II. THE EVIDENCE PRESENTED

Maria Hsia testified that she and James Robinson, whom she identified as corporate counsel for Maria Hsia & Associates, met with Brian Sun at the O'Neill firm in March 1997 in order to obtain counsel for herself and Hsia & Associates in connection with the campaign finance investigation. She said that she and Robinson attended three or four such meetings with Sun in March 1997 at which they provided the relevant facts to Sun. In early April 1997, Sun recommended that Hsia retain separate counsel to represent her individually, and he referred her to Gordon A. Greenberg. Hsia testified that it was also in April 1997 that Sun and Greenberg told her that there would be a joint defense arrangement between Sun, who was representing the Hsi Lai Temple and certain monastics in connection with the investigation, and Greenberg and Hsia.

Hsia testified that she continued to meet with Sun and Greenberg, as well as sometimes with Greenberg alone and sometimes with Sun alone. She shared information freely with both and understood that the information she shared with Greenberg was also shared with Sun. Sometimes other clients of Sun's also attended these meetings. She testified that she always believed the information she disclosed was privileged and confidential when it was shared with Sun and his other clients, but she now believes that Sun provided privileged information to the government without her permission. She testified that she attended approximately five or six meetings in Sun's office and that some of the meetings were quite lengthy because Sun, his partner Fred Friedman

and/or his legal assistant Stacy Cohen were gathering facts from those in attendance. She stated that while there was no retainer agreement between her and Sun or any other documentation with respect to their relationship, she believed that she had personally entered into a professional relationship with Sun and that, prior to his referring her to Greenberg, Sun was her personal attorney in connection with the campaign finance investigation. She said that whenever Robinson was present he was there on behalf of Hsia & Associates and not on her behalf.

James Robinson testified that over the years he represented both Hsia & Associates and the Hsi Lai Temple on general business matters, not on litigation matters. He said that when he learned about the campaign finance investigation he referred the Temple to Brian Sun and the O'Neill firm. He said that he and Hsia first met with Sun in late March 1997 to discuss Sun's possible representation of both Hsia and Hsia & Associates. He said that he arranged the meeting to help Hsia find counsel for both herself and her company in connection with the investigation and that he never told Sun or anyone else that he would be representing Hsia personally in connection with the investigation. The first meeting was introductory and preliminary; no substantive facts were discussed. Robinson testified that there was a second meeting, probably on March 28 or 29, 1997, that he, Hsia and two of the monastics attended with Sun at the O'Neill firm. At that meeting there was some discussion of the facts and circumstances that might be involved in the investigation, but Robinson could not remember the level of detail. He also testified that he did not recall at either of the first two meetings any discussion of conflicts of interest, multiple representation issues or a joint defense agreement.

Robinson testified that in early April 1997 there was a third meeting that he, Hsia, a number of monastics and Sun attended at the O'Neill firm. Facts were discussed in greater detail, including facts about Hsia's involvement in events now referenced in the indictment. He believes that there was a discussion of conflicts of interest and multiple representation at this meeting. While he did not specifically recall the term "joint defense agreement" being mentioned, he regarded the entire discussion as privileged and assumed that everyone present believed that it was. Robinson testified that it was probably at the fourth or fifth meeting that he attended at the O'Neill firm that Sun said he probably could not represent both the monastics and Hsia personally and recommended Gordon A. Greenberg as counsel for Hsia. During that meeting, Sun discussed the concept of a joint defense and a JDA. Robinson recalled that in the course of that discussion Sun expressly told Hsia that under such an arrangement they could all work together and share information freely without affecting the attorney-client privilege.[1]

Finally, Robinson testified that he attended a meeting on April 7, 1997—after Greenberg was formally representing Hsia in connection with the criminal matter—that was attended by several monastics, the defendant, Robinson, Sun and others but not Greenberg. Robinson testified that he did not believe he was there as Hsia's lawyer in connection with the campaign finance investigation. He said he was not sure why he was there but assumed he was there to help in the transition and to provide a comfort factor to Hsia and to Hsia & Associates; "my role was not defined."[2] In his testimony Robinson noted that the entire period from the

---

1. There was some confusion in Robinson's testimony in that he later stated that there might have been a reference to a JDA as early as the third meeting.

2. Robinson did make clear, however, that he did represent Hsia & Associates in connection with its responsibility to respond to a subpoena for documents addressed to it in connection with the investigation.

first introductory meeting in Sun's office in late March until the April 7, 1997 meeting, after Greenberg was representing Hsia, lasted only a week to ten days.

Brian Sun's recollection of events was different from that of Hsia and Robinson. He testified that he understood that Hsia and Robinson came to see him in late March 1997 to discuss the possibility of Sun representing the Hsi Lai Temple, and that Hsia was there as a representative of the Temple. Sun testified that he and his firm never represented Hsia personally and that he told her on more than one occasion that they did not represent her personally. He understood that Robinson and his firm represented Hsia personally for purposes of this investigation at the time of their early meetings. Sun testified that the issue of the need for separate representation of Hsia by an experienced criminal counsel came up at an early meeting he had with Hsia and Robinson. He advised Hsia and Robinson that she should have separate counsel experienced in criminal law because Robinson did not have any background in criminal law. At some point early on, Sun recommended Gordon A. Greenberg to Hsia because of his experience in criminal matters.

Sun testified that on more than one occasion he spoke with Hsia about joint defense agreements or arrangements and explained fairly early on that under such an arrangement information could be shared in a privileged way. He said that Greenberg and/or Robinson were present for one or more such discussions with Hsia. Sun testified that a joint defense agreement or arrangement was in fact entered into in early April, although it was never reduced to writing, and that a number of joint defense meetings were commenced with an acknowledgment that everything discussed would be privileged.[3] He said he did not know what Robinson or Greenberg may have told Hsia outside his presence about the joint defense arrangement. Sun also testified that Hsia provided facts and information regarding the substance of the investigation both before there was a JDA and afterwards and that he considered all such information privileged.

Sun testified that he began communicating with the government in early or mid-April 1997 and that Hsia and her counsel were aware of these meetings and communications. He testified that he never told the government there was a JDA but had discussions with Yaffe generally about such agreements, suggesting that they often can be helpful in sorting out the facts. Sun assumed that Yaffe may have inferred that there was such an agreement in this case. Sun testified that he never provided information to the government in violation of the information-sharing agreement. Sun stated that he understood and operated on the principle that he was free to

3. The defendant and the intervenors consistently have maintained that both the existence of a joint defense agreement and its terms are privileged matters. The defendant and intervenors have cited three cases to support their assertions: *A.I. Credit Corp. v. Providence Washington Ins. Co., Inc.*, No. 96 Civ. 7955 AGS AJP, 1997 WL 231127, at *4 (S.D.N.Y. May 7, 1997); *United States v. Bicoastal Corp.*, No. 92–CR–261, 1992 WL 693384, at *6 (N.D.N.Y. Sept. 28, 1992); and *In the Matter of the Two Grand Jury Subpoenas Duces Tecum Dated January 5, 1995*, No. 25016/95 (N.Y.Sup.Ct.1995) (Roberts, J.). As the government has pointed out, two of these cases are decisions by magistrate judges in other jurisdictions and the third is an unreported New York State Supreme Court decision, only a summary and excerpt of which have been provided by counsel. The facts in the cited cases are very different from those here, and none of the decisions contains any analysis; indeed, the court in *A.I. Credit* merely cited *Bicoastal* without discussion. These decisions do not convince this Court that either the existence or the terms of a JDA are privileged.

In any event, the existence of a joint defense arrangement or agreement and the fact that its terms were not reduced to writing were discussed by a number of witnesses in the public portion of the evidentiary hearing and essentially has been acknowledged by all parties to this motion. Sun testified about the precise terms of the oral agreement outside the presence of counsel for the government.

provide information to the government that he got from his own clients, and that he was always mindful not to disclose information that came from Hsia and the disclosure of which she had not authorized. Sun testified that in one or two areas he may have disclosed a very small amount of information that in fact came from Hsia, but he believed he had the consent of Hsia and her counsel to do so.

Sun's partner, Frederick Friedman, testified that he worked on this matter under Sun's supervision, that he had some telephone conversations with Yaffe over a nine to ten-month period, although most calls went to Sun, and that he attended a number of meetings with representatives of the government, some with Sun and four or five meetings without Sun. On some occasions Stacy Cohen was in attendance, as were certain of the firm's clients. Friedman said that his firm represented the Temple and certain monastics but never represented Hsia. He further testified that the firm provided the government with no privileged information that came from Hsia of which he was aware.

Stacy Cohen, a former legal assistant and investigator at the O'Neill law firm, testified that she worked extensively on the campaign finance matter. She understood that the O'Neill firm represented the Temple and that she was working for the Temple. Her job was to be present at most meetings, to take notes and to develop memoranda from the notes. She testified that she took notes of interviews and meetings with clients and was often present when Hsia attended meetings with Sun or with other clients of the firm. She testified that she was also in attendance at meetings with representatives of the government, both with prosecutors and FBI agents, on numerous occasions.

She said she probably spoke with Yaffe fifteen to twenty times without any lawyers from the O'Neill firm being involved, attended meetings with representatives of the government without O'Neill firm lawyers about five times, and went with

clients to the grand jury alone about five times. She testified that Yaffe called frequently to clarify certain factual matters or because he was frustrated that the monastics were not telling the whole story. She often sought guidance from Sun before responding to Yaffe, particularly with regard to any substantive or potentially privileged information. Cohen testified that she appeared before the grand jury as custodian of records but that Yaffe also began asking her substantive questions about Hsia. She left the grand jury room and consulted with Sun who talked with Yaffe, whereupon the questions stopped.

Cohen testified that she developed an understanding of the attorney-client privilege, the joint defense privilege and the work product doctrine both from her former job in the Arizona Attorney General's Office and from instructions on these topics given to her by members of the O'Neill firm, including Sun and Friedman. Cohen testified that she understood there to be a joint defense agreement in this case and that she even told the government several times during the summer of 1997 that representatives of the firm were able to have discussions with other attorneys and other individuals under a joint defense agreement. She said that she stamped every document she prepared "joint defense document." She further testified that she never provided the government with information that was subject to the JDA or with information that came from the defendant or her counsel and that to her knowledge the government never asked for information the O'Neill firm had learned from meetings with the defendant or her lawyer.

Gordon A. Greenberg, an attorney, through an affidavit declared that Brian Sun introduced him to Maria Hsia in April 1997. Sun informed him that Sun's firm would be representing the Hsi Lai Temple and certain of its monastics in connection with an investigation by the campaign finance task force. Greenberg was retained to represent Hsia individually in connec-

tion with the same investigation. Sun and Greenberg entered into a joint defense arrangement that would allow the parties and counsel to share privileged information and strategy and to treat this information as privileged. He understood that the parties would not disclose any information obtained from each other without permission. He declared that neither he nor his firm ever disclosed to the government any attorney-client or otherwise confidential or privileged information obtained from Hsia or any other party to the joint defense arrangement and never authorized Sun or his firm to disclose privileged information to the government with the possible exception of (1) the fact that Hsia was an activist in the Asian–American community and (2) the fact that Hsia had not engaged in fund-raising activity for a significant number of years.

Eric Yaffe, the lead prosecutor in this case, testified that after subpoenaing the Hsi Lai Temple on January 30, 1997 and Maria Hsia & Associates in March 1997 he began having dealings with Brian Sun and the O'Neill firm, first regarding the subpoenas and later regarding the scheduling of interviews for individuals the firm was representing. He dealt with Brian Sun, Frederick Friedman and Stacy Cohen and often talked directly with Cohen because Sun gave him permission to do so. He said that no one at the O'Neill firm ever said the firm was representing Maria Hsia; he understood the firm to be representing the Temple and certain of the monastics. David DeBruen of the law firm of Jenner & Block represented other monastics that were of interest to the government.

Yaffe testified that while Brian Sun never said there was a joint defense agreement, he did give indications that there might be such an agreement or arrangement. Sun never said who the parties to any such agreement or arrangement were, but Yaffe assumed the parties included the Temple, the monastics and Ms. Hsia. Yaffe testified that he never asked Brian Sun, Frederick Friedman, Stacy Cohen or any-

one else at the O'Neill firm for any privileged information that came from Ms. Hsia and, to his knowledge, no one ever provided him with such information. Yaffe testified that he always understood that the information provided to him by the O'Neill firm came from particular monastics whom Sun or DeBruen represented and from Temple documents. Mr. Yaffe testified that he was not aware of any information that had been presented to the grand jury that had come from Ms. Hsia, nor was he aware that any information contained in the indictment or in the bill of particulars came from Ms. Hsia. At least as early as April 1997, he assumed and believed there was a JDA between Greenberg and Sun, and by later in the summer he assumed that DeBruen and his clients were also involved in the joint defense.

Yaffe testified about a July 3 proffer session attended by Sun, Cohen and De-Bruen and a July 10 session attended by Friedman and Cohen. At that time he understood the O'Neill firm to be representing the Temple and at least two monastics, Man Ho and Yi Chu. He understood DeBruen to be representing four or five monastics. According to Yaffe, Sun and DeBruen told him that the facts that they were providing on July 3 came from their clients. Sun and DeBruen did not say from which clients which particular items of information came. The proffers did include information about the defendant that later found its way into the indictment, specifically including information about the defendant's involvement with donations to March Fong Eu and Don Knabe, her connection with John Huang, and her involvement with Vice President Al Gore's visit to the Hsi Lai Temple. Indeed, most of the events discussed at the proffer sessions involved Maria Hsia. While Yaffe did not discuss with counsel which witnesses would be able to testify about which events, he understood that the sources of the information he was being provided were Man Ho, Yi Chu and perhaps other monastics. Yaffe testified that

Man Ho and Yi Chu were given immunity on the basis of the proffers of counsel and that he did not interview them until later.[4] By and large, he said that the matters that Man Ho and Yi Chu discussed in the interviews were essentially the same matters that were proffered by counsel. Yaffe remembers that either Man Ho or Yi Chu mentioned a conversation with the defendant about Don Knabe. After the interviews, however, Yaffe told Sun that the government was concerned that Man Ho and Yi Chu were not telling the government or even their own lawyers everything they knew.

Yaffe testified that at a meeting on November 18, 1997, Nancy Luque, now representing the defendant Maria Hsia, raised the issue of taint, arguing that privileged information in violation of the joint defense agreement had been provided to the government and used in connection with the investigation and grand jury proceedings; she urged the government to investigate. Yaffe testified that the government in fact looked into the matter by reviewing prosecutors' notes and talking to various FBI agents. He also asked Sun if he or his firm had provided the government with any privileged information that came from Hsia, and Sun said that they had not. Yaffe also testified that while the government did not undertake a formal investigation, it was somewhat hampered in pursuing the matter further than it did because Luque declined to provide the government with the nature of the privileged information she said had been used.

Nancy Luque testified that after she began representing Ms. Hsia she learned that Stacy Cohen had done all of the fact memoranda of interviews of all of the witnesses and that the government had often been in direct contact with Cohen. She also testified that Cohen soon began calling her and asking for information from Hsia because Yaffe was asking Cohen for information or clarification. There were three specific matters that Luque remembered Cohen saying Yaffe had wanted to know about: the alleged reimbursement of Shin He, the Fu Tien account, and March Fong Eu. Luque never gave Cohen the information she wanted but became concerned that information about the defendant had been going directly from the O'Neill firm to the government from the very beginning of Sun's clients' cooperation. She complained about the use of privileged information in the investigation and requested a meeting with the government. She declined Yaffe's invitation to meet jointly with the government and Sun, but did meet with the government on November 18, 1997.

Finally, Maria Hsia's affidavit appends excerpts of Frederick Friedman's and Stacy Cohen's memoranda of meetings at the O'Neill firm from April 7, 1997 on (by which time Ms. Hsia was being represented by Mr. Greenberg), as well as a copy of the indictment and the bill of particulars annotated to indicate which allegations and/or facts she maintains could have come only from information provided by Ms. Hsia during privileged joint defense communications.

### III. FINDINGS OF FACT

The Court finds the following facts from the evidence presented:

1. Mr. Sun and the O'Neill law firm never represented Maria Hsia personally, and Mr. Sun told her on more than one occasion that they did not represent her.

2. Ms. Hsia may have been represented by James Robinson personally at the first of several meetings at the O'Neill law firm in late March 1997, or she may simply have attended the meeting with Mr. Robinson as representatives of the Hsi Lai Temple.

---

4. During one of the proffer sessions, Sun mentioned a meeting of counsel at which Ms. Hsia was present, so Yaffe was then aware that clients, as well as lawyers, attended joint defense meetings and assumed that everyone was talking to each other as part of the joint defense.

3. Very little of substance was discussed at the first meeting. Substantive discussions began to take place at the second meeting on March 28 or 29, 1997, where Ms. Hsia was either unrepresented or represented by Mr. Robinson.

4. At an early meeting, Mr. Sun advised Ms. Hsia and Mr. Robinson that Ms. Hsia should have separate counsel with criminal defense experience and recommended Mr. Greenberg, whom Ms. Hsia promptly retained. Mr. Greenberg began representing Ms. Hsia before April 7, 1997.

5. The concept of a joint defense agreement was discussed with Ms. Hsia and Mr. Robinson (among others) at an early meeting, and then later with Mr. Greenberg. It was discussed more than once. Mr. Sun expressly told Ms. Hsia that under such an arrangement they could all work together and share information freely without compromising the attorney-client privilege. A joint defense arrangement was entered into in early April but was never reduced to writing.

6. Ms. Hsia provided facts and a great deal of information regarding the substance of the matters under investigation at numerous joint defense meetings, some of which were quite lengthy. Mr. Sun and his colleagues at the O'Neill firm, as well as Mr. Greenberg when he became involved, considered all such information privileged. It was understood by everyone, including Ms. Hsia, that the parties would not disclose information obtained from each other without permission.

7. Mr. Sun began talking with the government in an effort to obtain immunity for his clients in early or mid-April 1997.

8. At some point in its discussions with Mr. Sun and Ms. Cohen, the government knew or should have known that there was a joint defense arrangement.

9. Mr. Sun, Mr. Friedman and Ms. Cohen did not provide information to the government in violation of the joint defense agreement. Mr. Sun might have provided two small pieces of otherwise privileged information, though such information was disclosed to the government (if at all) with the consent of Ms. Hsia or Mr. Greenberg. While Mr. Sun did not testify either in open court or *in camera* what the two pieces of information were (or might have been), the Court finds from Mr. Greenberg's affidavit that they were most likely (1) the fact that Ms. Hsia was an activist in the Asian–American community; and (2) the fact that Ms. Hsia had not engaged in fund-raising activity for a significant number of years, which information Mr. Greenberg (might have) permitted Mr. Sun to disclose to the government.

10. The government never asked anyone at the O'Neill firm for any privileged information that came from Ms. Hsia. To its knowledge, no one at the O'Neill firm ever provided the government with such privileged information. To its knowledge, the government did not present any such information to the grand jury that came from Ms. Hsia and did not base any part of the indictment or bill of particulars on such information.

11. The evidence before the Court does not demonstrate by a preponderance of the evidence that any allegations or facts included in the indictment or the bill of particulars came exclusively from Ms. Hsia. The Frederick Friedman and Stacy Cohen memoranda often do not indicate who provided what information at joint defense meetings, and Ms. Hsia's affidavits and testimony are largely uncorroborated and conclusory on this issue. So far as appears from the record before the Court, the witnesses on whose behalf proffers were made and who later were interviewed and testified before the grand jury had a basis for independent knowledge concerning matters about which they testified.

12. In November 1997, the government investigated the defendant's allegation that it had obtained privileged information in violation of the JDA. The results of the investigation, although limited, did not

support defendant's allegation. The government specifically asked Mr. Sun if he or his firm had provided such information and Mr. Sun said that they had not.

## IV. DISCUSSION

■ The attorney-client privilege is one of the oldest recognized privileges for the protection of confidential communications between a client and her attorney. *Swidler & Berlin v. United States,* 524 U.S. 399, 403, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998) (*quoting Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)). The existence of the privilege ensures "full and frank communication between attorneys and their clients" and is essential to the maintenance of the confidentiality of attorney-client communications needed to promote the effective rendering of legal services. *Upjohn Co. v. United States,* 449 U.S. at 389, 101 S.Ct. 677; *In re Sealed Case,* 107 F.3d 46, 49 (D.C.Cir.1997). The joint defense privilege, often referred to as the common interest rule, is an extension of the attorney-client privilege that protects from forced disclosure communications between two or more parties and/or their respective counsel if they are participating in a joint defense agreement. *In re Sealed Case,* 29 F.3d 715, 719 n. 5 (D.C.Cir.1994); *Haines v. Liggett Group, Inc.,* 975 F.2d 81, 94–95 (3rd Cir.1992); *First American Corp. v. Al–Nahyan,* No. 96–ms–25, 1996 WL 170121, at *4 (D.D.C. March 26, 1996). It permits a client to disclose information to her attorney in the presence of joint parties and their counsel without waiving the attorney-client privilege and is intended to preclude joint parties and their attorneys from disclosing confidential information learned as a consequence of the joint de-

fense without permission. *First American Corp. v. Al–Nahyan,* 1996 WL 170121, at *4.

### A. Government Intrusion into Defendant's Attorney–Client or Joint Defense Privilege

■ Defendant first argues that the government intruded into Ms. Hsia's attorney-client relationship with Brian Sun and his firm and/or with the joint defense privilege between her and her lawyer (Mr. Greenberg) and Mr. Sun and his clients. She maintains that the intrusion so infected the entire investigation and the subsequent indictment that her Sixth Amendment right to counsel was violated and that she has been irreparably harmed. She relies primarily on the decision of the D.C. Circuit in *United States v. Kelly,* 790 F.2d 130 (D.C.Cir.1986). In *Kelly,* the court adopted a four-part test to determine whether a defendant has been sufficiently prejudiced when the government has allegedly intruded upon her attorney-client privilege to constitute a Sixth Amendment violation: (1) whether evidence to be used at trial was obtained directly or indirectly by the alleged intrusion; (2) whether the alleged intrusion by the government was intentional; (3) whether the prosecution received otherwise confidential information about trial preparations or defense strategy as a result of the alleged intrusion; and (4) whether the privileged information was used to the substantial detriment of the defendant. *Id.* at 137; *see United States v. Neill,* 952 F.Supp. 834, 840 (D.D.C. 1997). Although the facts in *Kelly* bear little relationship to those in the case at bar, the four *Kelly* factors are instructive and will be applied to the situation presented here.[5]

---

**5.** In *Kelly,* a government agent invaded the defendant's defense strategy sessions and literally stole relevant and important documents. *United States v. Kelly,* 790 F.2d at 136. In both *Kelly* and *Neill,* the two cases primarily relied upon by defendant, the invasion of the defendant's attorney-client privilege was undisputed. The open issue was

whether the defendant had been so prejudiced by the intrusion that his Sixth Amendment rights had been violated. By contrast, the issue of whether an intrusion into defendant's joint defense privilege has even occurred in the first place is at the heart of the matter in the case at bar.

Much of the testimony in this case went to the first of the *Kelly* factors: whether the evidence to be used at trial—or in this case considered by the grand jury in indicting the defendant—was obtained directly or indirectly by an alleged intrusion into the attorney-client privilege. To carry her burden, it seems to the Court that the defendant would have to show a string of facts: that information was provided by Hsia to Sun and the O'Neill firm, that such information was provided either pursuant to a direct attorney-client relationship between Hsia and Sun or pursuant to a joint defense agreement, that the information was passed to the government without Ms. Hsia's consent and in violation of the JDA, that specific pieces of that information were essential to the indictment and prosecution of Hsia, and that those pieces of information could not have come from any source other than Hsia. Although the case law does not make clear the standard by which a defendant must prove each of these facts in order to satisfy this (or any other) element of the *Kelly* test, it is safe to say that defendant would be required to show proof by at least a preponderance of the evidence and that "there must be a substantial demonstration of prejudice before an indictment can be dismissed." *United States v. Neill,* 952 F.Supp. at 840. Defendant has failed here to meet that standard.[6]

Certainly information was provided by Hsia to Sun and the O'Neill firm. The O'Neill firm did not represent Hsia, and there therefore was no direct attorney-client relationship. There was, however, a joint defense arrangement agreed to within a week to ten days of Hsia's first meeting with Sun. All information provided thereafter was privileged, and Hsia, Sun and Greenberg all understood that information communicated even before then was to be treated as privileged as well.

Ms. Hsia indisputably provided substantive information in her meetings with Sun, Greenberg, Stacy Cohen and others and the information provided was subject to the joint defense agreement. It therefore was privileged and was to be treated as such.

Although defendant has demonstrated that she provided privileged information to Sun and the O'Neill firm pursuant to a joint defense agreement, she has failed to prove the next and most essential link in the chain of facts required to satisfy the first prong of *Kelly:* that the privileged information was passed to the government without her consent and in violation of the JDA. Sun, Friedman and Cohen all testified that no privileged information was passed by the firm to the government, and the government confirmed that, to its knowledge, it received no such information. Sun did make reference to two small pieces of otherwise privileged information that might have been passed to the government, but stated that such information would have been disclosed with the consent of Ms. Hsia or Mr. Greenberg. Mr. Greenberg's affidavit confirms this testimony, and the Court has found that if such information was communicated to the government the disclosure was not a violation of the JDA because the disclosure was made with Ms. Hsia's consent.

The evidence adduced in this matter is even more sparse with regard to the last two factual links that defendant must prove to satisfy the first *Kelly* element. The testimony, both in open court and in closed session, and the sealed submissions to the Court offer scant evidence that specific pieces of privileged information received by the government, if any, were essential to the indictment and prosecution of Hsia, or that such information could only have come from Ms. Hsia. Because of

---

**6.** Even one of the cases on which defendant primarily relies, *United States v. Schwimmer,* 924 F.2d 443, 447 (2d Cir.1991), states that unless the conduct of the government has been "manifestly corrupt," to obtain relief a defendant must show "prejudice from the intentional invasion of the attorney-client privilege." Here defendant has failed to show manifest corruption, intentional invasion or actual prejudice.

the delicate nature of the evidence offered by defendant in an attempt to prove these facts, most of the evidence on these points was offered *ex parte* and through sealed submissions to the Court. Without addressing the specifics of this evidence, the Court can say without hesitation that none of it came close to proving by a preponderance of the evidence (or even by a lesser standard) that the government obtained specific pieces of privileged information from Ms. Hsia via Mr. Sun (with two possible exceptions), or that it made critical use of any such information in the investigation, indictment or prosecution of Hsia. Furthermore, defendant has not demonstrated that any such information could not have come from a source other than Ms. Hsia. Indeed, much of the evidence supports precisely the opposite conclusion.

■ Defendant also has failed to prove the second and, in this Court's opinion, most critical prong of the *Kelly* test: that if an intrusion into the joint defense privilege did occur, the alleged intrusion was intentional. *See* Part IV.B. of this Opinion and Order. In fact, the Court finds that defendant has failed to carry her burden of proving *any* of the four *Kelly* factors and therefore concludes that Ms. Hsia's Sixth Amendment rights have not been violated.[7]

*B.   Outrageous Government Conduct*

Defendant next argues that the government's conduct has been so reprehensible, outrageous and adverse to the interests of justice that her Fifth Amendment right to due process has been violated and that she is completely unable to obtain a fair trial. Specifically, defendant argues that because the government has engaged in particularly outrageous conduct with regard to its intrusion into her attorney-client and joint defense privileges, the indictment must be dismissed or, at the very least, the prosecutors must be disqualified from this case. The Court disagrees.

The Supreme Court has considered when particularly outrageous conduct toward a defendant in a criminal case affects the defendant's ability to receive a fair trial, recognizing that a situation may exist where "the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *see United States v. Voigt,* 89 F.3d 1050, 1064–65 (3rd Cir.1996); *United States v. Marshank,* 777 F.Supp. at 1524; *cf. United States v. Kelly,* 707 F.2d 1460, 1468 (D.C.Cir.1983).

■ Defendant points to one case, *United States v. Voigt,* 89 F.3d 1050 (3rd Cir. 1996), where these principles have been applied to government conduct specifically related to an intrusion into the attorney-client relationship, though in a different context. In *Voigt,* the defendant alleged that the government had recruited his attorney as an undercover agent to pass privileged information to the prosecution. *Id.* at 1061. The court in *Voigt* considered three factors to determine whether the government conduct was so outrageous as

7. Defendant's heavy reliance on *United States v. Marshank,* 777 F.Supp. 1507 (N.D.Cal. 1991), is misplaced. In *Marshank,* the court dismissed the indictment because, *inter alia,* the government knowingly intruded on the defendant's attorney-client privilege by using the defendant's attorney as a government informant. The evidence in *Marshank* showed that the informant/attorney had an ongoing relationship with agents of the federal government, including the Assistant United States Attorney assigned to the case, and was encouraged by the government to actively aid the government's investigation of the defen-

dant. Defense counsel even testified against his client before the grand jury. *Id.* at 1524. The court in *Marshank* found that there was a pervasive intrusion and that the government had knowledge of and was an active participant in such intrusion. *Id.* The court further found that regardless of intent, the government's conduct was outrageous and reprehensible and that "[e]vidence obtained through government misconduct was used against Marshank at every turn." *Id.* at 1521. The facts in this case do not come close to those in *Marshank.*

to constitute a violation of due process and require dismissal of the indictment on Fifth Amendment grounds: (1) the government's objective awareness of an ongoing, personal attorney-client relationship between its informant (the attorney) and the defendant; (2) deliberate intrusion by the government into that relationship; and (3) actual and substantial prejudice to the defendant. *See id.* at 1067.

In this case, the evidence demonstrates that the government knew or should have known that a joint defense agreement existed and that it therefore had an objective awareness of a joint defense relationship between the O'Neill law firm and the defendant. The first prong of the *Voigt* test therefore is satisfied. The defendant has failed, however, to carry its burden of proving that the government deliberately intruded on that relationship, if it intruded at all, or that the defendant has been or will be actually and substantially prejudiced by the alleged intrusion. Defendant's allegation that the government purposefully took advantage of its supposed knowledge of a joint defense agreement by "squeez[ing] information about Ms. Hsia from the O'Neill Firm and its clients" simply is not supported by the facts. Defendant's Proposed Findings of Fact and Conclusions of Law in Connection with Her Motion to Dismiss the Indictment Because It Is Tainted ("Defendant's Proposed Findings"), December 28, 1999, at 26. Indeed, defendant's allegation is wholly undercut by the testimony not only of Mr. Yaffe, but also that of Mr. Sun, Mr. Friedman, Ms. Cohen and Mr. Greenberg. Defendant's argument rests entirely on her own supposition.

Defendant's naked assertion that the government has an affirmative duty to take "painful steps" to assure that each and every piece of information that it receives in such a complex investigation is not the product of a joint defense agreement, Defendant's Proposed Findings at 26, is without foundation, has no law to support it, and is patently unrealistic. De-

fendant's prime example of the government's "deliberate intrusion" into Hsia's privileges and its "outrageous conduct" is illustrative of the weakness of her argument. *Id.* at 25–28. Defendant claims that the government committed a conspicuous and reprehensible act by continuing to investigate and eventually indict Hsia on matters that were raised by defense counsel at the November 18, 1997 meeting between Luque and Yaffe. The testimony showed that the government met with defense counsel, was advised of the possibility of tainted evidence, investigated the suspicion, found no apparent taint and continued with its investigation, using testimony and evidence that it believed and continues to believe was legitimately obtained. Yet defendant argues that the government has committed grave injustices by continuing to investigate matters discussed during the November 18 meeting. Hsia essentially suggests that any events or facts that defense counsel raised in a meeting with the government are thereafter immune from further investigation and prosecution. That simply is not the law and would make no sense for reasons that are too apparent to merit discussion.

Although defendants often invoke the doctrine of outrageous government conduct as a defense, "courts have rejected its application with almost monotonous regularity." *United States v. Voigt*, 89 F.3d at 1065 (*quoting United States v. Santana*, 6 F.3d 1, 4 (1st Cir.1993) ("The banner of outrageous misconduct is often raised but seldom saluted.")); *United States v. Twigg*, 588 F.2d 373 (3rd Cir.1978) (only reported case in which the doctrine has been applied since 1976). The Court rejects defendant's argument that the government has engaged in outrageous conduct and that the indictment should be dismissed.

### C. The Court's Supervisory Power

Finally, defendant argues that the Court has a duty in this case to provide a remedy pursuant to its supervisory powers, a doc-

**20**

trine that arguably authorizes a court to act when it perceives a clear injustice which requires some remedial action, even when "there is no effective alternative provided by rule, statute, or constitutional clause." *United States v. Horn,* 29 F.3d 754, 760 (1st Cir.1994); *see United States v. Hasting,* 461 U.S. 499, 505, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983); *Smith v. Katzenbach,* 351 F.2d 810, 816 (D.C.Cir.1965). To the extent that the primary purpose for this doctrine is the preservation of the integrity of the judicial process, *United States v. Hasting,* 461 U.S. at 505, 103 S.Ct. 1974, *United States v. Omni International Corp.,* 634 F.Supp. 1414, 1436–38 (D.Md.1986), the foregoing discussion demonstrates that neither the integrity of the Court nor its grand jury has been tainted by the conduct of the government alleged here. As the Court already has stated, after a two-day evidentiary hearing and numerous rounds of briefing the defendant has failed to show that she has suffered any deprivation of her rights, constitutional or otherwise, because of any misconduct by the government, the O'Neill firm or anyone else. The Court therefore rejects defendant's attempt to dismiss the indictment on this third and final theory.

### V. CONCLUSION

Because the defendant has failed to provide sufficient evidence under any of the three theories she has presented to the Court, defendant's motion to dismiss the indictment on grounds of taint will be denied. For all of the reasons stated above, it is hereby

ORDERED that defendant's motion to dismiss the indictment because it is tainted is DENIED.

SO ORDERED.