**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 4, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MAX L. ARY,

Defendant - Appellant.

No. 06-3383

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 05-CR-10053-JTM)**

---

Stephen M. Joseph, Joseph & Hollander PA, Wichita, Kansas, for Defendant-Appellant.

Eric F. Melgren, United States Attorney (Debra L. Barnett, Assistant United States Attorney, and Annette B. Gurney, Assistant United States Attorney, with him on the brief), District of Kansas, Wichita, Kansas, for Plaintiff-Appellee.

---

Before **MURPHY** and **O'BRIEN**, Circuit Judges, and **KANE**,[*] District Judge.

---

**MURPHY**, Circuit Judge.

---

[*]The Honorable John L. Kane, United States District Judge, District of Colorado, sitting by designation.

Max L. Ary was convicted on numerous counts of mail and wire fraud, theft of government property, transportation of stolen property, and money laundering.[1] Ary's convictions stem from various transactions involving space artifacts. He appeals his convictions, arguing the district court erred (1) by concluding Ary waived the work-product protection and attorney-client privilege; and (2) by allowing the introduction of hearsay evidence at trial. Ary also appeals his sentence, claiming the district court erred in its calculation of loss. Exercising jurisdiction pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291, we **affirm**.

## I.     Background

Ary was the President and Chief Executive Officer of the Kansas Cosmosphere and Space Center ("Cosmosphere"), a space museum in Hutchinson, Kansas. He was hired to manage the museum in 1976 and was continuously employed by the Cosmosphere until he resigned in 2002 and moved to Oklahoma City, Oklahoma. The Cosmosphere is home to a significant collection of United States and Soviet space artifacts. Many of the artifacts in the Cosmosphere collection are owned by the museum and were either purchased by or provided to the museum by private donation. Others are provided to the museum on loan

---

[1]Ary was convicted of wire fraud in violation of 18 U.S.C. § 1343; mail fraud in violation of 18 U.S.C. § 1341; theft of government property in violation of 18 U.S.C. § 641; interstate transportation of stolen goods in violation of 18 U.S.C. § 2314; and money laundering in violation of 18 U.S.C. § 1957. The jury also found criminal forfeiture in the amount of $124,140.

from institutions such as the Smithsonian, the United States Air Force, the National Air and Space Museum, the International Space Hall of Fame, and the National Aeronautics and Space Administration ("NASA").

Following Ary's departure from the Cosmosphere, the museum discovered some items in its collection, which were on loan from NASA, were missing. Further investigation revealed the items had been sold at auction through Superior Galleries, an auction house located in California. The museum, however, had not been paid for the missing NASA items sold at auction. Around 1999, Ary established two accounts with the auction house. The first was in the Cosmosphere's name and was used to sell items on behalf of the museum. The second was a personal account in Ary's name. When the Cosmosphere contacted the auction house, it learned Superior Galleries sold these items through Ary's personal account. The proceeds, therefore, were mailed to the defendant and not the Cosmosphere. Over the span of several years, Ary sold numerous space artifacts belonging to the Cosmosphere and the United States Government.

## A.   Attorney-Client Privilege and Work-Product Doctrine Claims

Ary soon learned he was under investigation and sought legal counsel. He hired Attorney Lee Thompson, who informed the United States Attorney and the Criminal Chief for the District of Kansas that he represented the defendant. Thompson instructed Ary to prepare notes and summaries of his involvement with the sale of artifacts at the Cosmosphere. Ary also collected items from his house

belonging to the Cosmosphere, placed them in three boxes, and delivered them to Thompson.

On December 18, 2003, a federal search warrant was executed at the defendant's residence in Oklahoma City, Oklahoma. The agents executing the warrant seized eleven boxes, some of which were labeled "Artifacts." Several items in these boxes were Cosmosphere artifacts. Agents also seized two computers, a black plastic file box containing documents and other miscellaneous documents. Several days later, Ary's defense counsel, Thompson, turned over the three boxes Ary had previously delivered to him.

Following the search of Ary's home, Thompson wrote to Assistant United States Attorney ("AUSA") Debra Barnett on December 22, 2003, and advised her that it "appears as though the search resulted in the seizure of computers and other files containing what is clearly attorney client privileged communications" and urged "that immediate steps be taken to avoid purposeful intrusion by the government into the attorney-client relationship and communications." A second letter was sent on January 5, 2004, identifying files and other items counsel believed to be privileged. AUSA Barnett sent Thompson a letter dated January 28, 2004, in which she included a Compact Disc copy of the computers' files and informed Thompson that a "taint team" had determined several computer files were privileged. The letter assured Thompson the material "will not be reviewed or examined by [Barnett] as part of this investigation." Further, AUSA Barnett

informed Thompson that the taint team had been asked to review numerous files that were currently in FBI possession and would contact Thompson when the review was complete.

On February 13, 2004, Thompson was informed that the review was complete and the government returned additional items it deemed privileged. Following this meeting, there were no further communications regarding privileged material and no additional items were returned to Ary. Over a year later, on May 25, 2005, Thompson went to the United States Attorney's office to review Rule 16 discovery materials. Fed. R. Crim. P. 16(a)(1)(E). One of the items provided for review was a container titled "One black plastic box containing misc. documents." The contents of the box included tax returns, calendars and a number of individual file folders containing numerous summaries and analyses of items sold at auction and related information pertaining to Ary's status with the Cosmosphere. A second box, labeled "Box 2," contained files categorized by the names of items sold at auction and was prepared by the government's investigative agents. Each file in the box contained copies of printed and handwritten notes that were also found in the black plastic box. Many of these documents were originally printed from the contents of the computers and indexed under headings such as "Lee Thompson Information" or "Court Case." Defense counsel made a photocopy of these documents but did not

immediately review them or inform the United States Attorney's Office that the contents of these boxes might contain privileged information.

On July 15, 2005, the defendant moved to suppress any use of the documents in the two boxes. Ary claimed the files in the black plastic box were prepared in anticipation of litigation and were similar to the documents the government conceded were privileged and returned to Ary. Ary further complained these documents were found in the investigative files used by the government. The district court examined the documents *in camera* and determined the "vast majority of these documents are records that would be viewed by third parties and thus not protected under attorney-client privilege." *United States v. Ary*, No. 05-10053-01, at 13 (D. Kan. Sept. 27, 2005) (order denying motion to suppress). It determined, however, that the defendant's handwritten notations on the documents, as well as the way in which they were assembled, may raise the issue of work-product protection. *Id*. The district court nevertheless concluded that because counsel failed to raise the issue when he first reviewed the contents of the boxes at the Rule 16 discovery meeting he waived the protection. *Id*.

**B.     Introduction of Database Records**

A jury trial commenced on October 18, 2005. Ary objected to the admission of the Cosmosphere's computer and paper inventory records concerning the stolen artifacts. These records were introduced to show the

Cosmosphere or the government owned the artifacts in question.  Ary argued the records were inadmissible hearsay.  The court overruled Ary's objections, admitted the exhibits, and permitted Ary a continuing objection to all of the Cosmosphere's records on the basis of foundation and hearsay.

### C.      Calculation of Amount of Loss at Sentencing

The jury returned its verdict on November 1, 2005.  The presentence report ("PSR") calculated Ary's base level pursuant to Section 2S1.1 of the U.S. Sentencing Guidelines Manual ("U.S.S.G."), which concerns money laundering.  Under this guideline, the base offense level is determined from the guideline for the underlying offense, in this case theft and fraud.  U.S.S.G. § 2S1.1(a)(1).  The base offense level was therefore determined using Section 2B1.1, which concerns theft and fraud offenses.

Section 2B1.1 of the Sentencing Guidelines provides a base offense level of seven for crimes involving monetary transactions in property derived from unlawful activities and includes an enhancement based on the dollar value of loss.  When the amount of loss exceeds $200,000, but is less than $400,000, the offense level is increased by twelve levels.  *Id*. § 2B1.1(b)(1)(G).  Because the PSR calculated the amount of loss to fall within this range, it recommended a twelve-level increase.

Ary objected to the PSR's loss calculation.  First, Ary argued the PSR took into account items Ary sold at auction that were not included in the indictment.

He argued ownership was not proved at trial or sentencing. Ary also objected to the use of "auction value" to fix the loss for the artifacts delivered to the government by Ary's lawyer and seized at his residence. The district court overruled Ary's objection and adopted the PSR's calculation of loss.

The district court sentenced Ary to thirty-six months' imprisonment. Ary raises three arguments on appeal. He contends the district court erred by (1) failing to hold an evidentiary hearing and concluding Ary waived the work-product protection and attorney-client privilege; (2) admitting the Cosmosphere's computer and paper inventory records and; (3) improperly calculating amount of loss for the purpose of sentencing.

## II.   The Attorney-Client Privilege and Work-Product Doctrine

Ary claims the contents of the black plastic box[2] were protected and the district court erred by failing to conduct an evidentiary hearing.[3] This court reviews the district court's rulings on attorney-client privilege and work-product

---

[2]We refer to the items in the black plastic box and those found in the box labeled "Box 2" jointly as the "black plastic box." The district court found the items in Box 2 were derived from the material in the black plastic box. Ary does not challenge this finding.

[3]Although different standards apply to the work-product doctrine and attorney-client privilege, Ary does not distinguish the two on appeal. *In re Foster*, 188 F.3d 1259, 1272 (10th Cir. 1999) (explaining the work-product doctrine is broader than the attorney-client privilege). Instead, he discusses solely attorney-client privilege. Because the district court concluded the work-product protection and attorney-client privilege had been waived and Ary makes a general argument that he did not waive protection, we discuss both.

protection for abuse of discretion.  *Frontier Ref., Inc. v. Gorman-Rupp Co.*, 136

F.3d 695, 699 (10th Cir. 1998).  Underlying factual determinations are reviewed

for clear error and purely legal questions are reviewed de novo.  *Id.*  We review

the denial of an evidentiary hearing for an abuse of discretion.  *United States v.*

*Smith*, 413 F.3d 1253, 1282 (10th Cir. 2005).  "A trial court must grant an

evidentiary hearing on a motion to suppress only if the defendant has evidence

justifying relief."  *United States v. Chavez-Marquez*, 66 F.3d 259, 261 (10th Cir.

1995) (quotation omitted); *In re Grand Jury Subpoena*, 274 F.3d 563, 576 (1st

Cir. 2001) (explaining evidentiary hearing on claim of work-product protection

not required when the parties have a full and fair opportunity to present relevant

facts and arguments and rebut the opponent's submissions).

## A.    Attorney-Client Privilege

"The attorney-client privilege is the oldest of the privileges for confidential

communications known to the common law."  *Upjohn Co. v. United States*, 449

U.S. 383, 389 (1981).  "Its purpose is to encourage full and frank communication

between attorneys and their clients and thereby promote broader public interests

in the observance of law and administration of justice."  *Id.*  Under the common

law, the privilege will only be recognized when "the communication between the

client and the attorney is made in confidence of the relationship and under

circumstances from which it may reasonably be assumed that the communication

will remain in confidence." *In re Qwest Commc'n Int'l. Inc.*, 450 F.3d 1179, 1185 (10th Cir. 2006) (quotation omitted).

Because confidentiality is critical to the privilege, it will be "lost if the client discloses the substance of an otherwise privileged communication to a third party." *Id.* (quotation omitted). "The confidentiality of communications covered by the privilege must be jealously guarded by the holder of the privilege lest it be waived." *Id.* (quotation omitted). Where disclosure to a third party is voluntary, the privilege is waived. *Id.*

**B.      Work-Product Doctrine**

The work-product doctrine, first recognized by the Supreme Court in *Hickman v. Taylor*, 329 U.S. 495, 509-11 (1947), "shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case."[4] *United States v. Nobles*, 422 U.S. 225, 238 (1975). "In performing his various duties . . . it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." *Hickman*, 329 U.S. at 510.

---

[4]Unlike the attorney-client privilege, the work-product doctrine is distinguishable from the testimonial "true" privileges. *See In re Qwest Commc'n Int'l. Inc*, 450 F.3d 1179, 1185 n.3 (10th Cir. 2006). The work-product doctrine is codified in Fed. R. Civ. P. 26(b)(3) and is therefore excepted from Fed. R. Evid. 501. Our analysis, however, focuses on the common law. The fact that the work-product doctrine is not a true privilege is not material in this case.

Work-product protection "extends to the production of material assembled by an attorney in preparation for impending litigation." *Thompson v. United States (In re September 1975 Grand Jury Term)*, 532 F.2d 734, 738 (10th Cir. 1976) (quotation omitted). The protection also applies to materials prepared by an attorney's agent, if that agent acts at the attorney's direction in creating the documents. *Nobles*, 422 U.S. at 238-39. The protection of work-product, however, is not absolute and may be waived. *Id.* at 239. The voluntary production of work-product material during discovery may waive a work-product objection. *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 668-69 (10th Cir. 2006). Courts will imply waiver when a party claiming the protection has voluntarily disclosed work product to a party not covered by the work-product doctrine. *Hanson v. United States Agency for Int'l Dev.*, 372 F.3d 286, 293-94 (4th Cir. 2004).

## C.     Waiver of Involuntarily Disclosed Material

When material is seized pursuant to a search warrant, production is not voluntary. *See United States v. de la Jara*, 973 F.2d 746, 749 (9th Cir. 1992). Although this court has addressed waiver of the work-product doctrine and attorney-client privilege for voluntary or inadvertent disclosures, we have not addressed the issue of waiver when production of the evidence is compelled.[5]

---

[5]*In re Qwest Communications International Inc.* examined a claim of attorney-client privilege and work-product protection where documents were

(continued...)

Although the attorney-client privilege and work-product doctrine are distinct, courts have treated them identically when considering involuntary disclosure. *See In re Grand Jury (Impounded)*, 138 F.3d 978, 981 (3d Cir. 1998) (relying on attorney-client waiver case law in a work-product protection case). We see no distinction between the attorney-client privilege and work-product doctrine that would result in different standards of waiver for involuntary disclosure. This court, therefore, applies the same waiver analysis to the privilege and the doctrine.

Other courts have examined three main factors in determining whether protection has been waived when material has been involuntarily disclosed: (1) the specificity with which the defendant identifies the material; (2) the expediency by which the defendant informs the government that it seized protected material; and (3) the expediency by which the defendant seeks judicial action to enforce the protection.

When the party seeking protection fails to specifically identify the materials protected, courts have uniformly found a waiver. In the context of a discovery request in civil litigation, the Ninth Circuit held that general assertions of privilege or work-product protection are insufficient. *See Burlington N. & Santa Fe Ry. Co. v. District Court*, 408 F.3d 1142, 1149 (9th Cir. 2005); *see also*

[5](...continued)
turned over pursuant to a subpoena. 450 F.3d at 1181. At oral argument, however, Qwest disclaimed that production was involuntary. *Id*. at 1181 n.1.

-12-

*United States v. White*, 970 F.2d 328, 334-35 (7th Cir. 1992) (holding failure to timely assert attorney-client privilege for each specific communication or document constitutes waiver); *United States v. Neill*, 952 F. Supp. 834, 842 (D.D.C. 1997) (concluding failure to specifically identify computer files seized by government as protected by the attorney-client privilege constitutes waiver). There is no waiver, however, when the court is provided enough specificity to evaluate whether each document is protected. *See Burlington N. & Santa Fe. Ry. Co.*, 408 F.3d at 1149.

Identification of protected material must occur in a timely fashion. Where the party seeking protection "fails to pursue all reasonable means of preserving the confidentiality of the privileged matter" the protection is waived. *See de la Jara*, 973 F.2d at 750 (holding defendant waived attorney-client privilege when he made no attempt to assert privilege for six months); *Peat, Marwick, Mitchell & Co. v. West*, 748 F.2d 540, 542 (10th Cir. 1984) (holding failure to make a timely showing waived work-product protection under Fed. R. Civ. P. 34(b)).

Some courts have held that asserting protection solely to the government is insufficient and that invocation of judicial intervention is required. *See In re Grand Jury (Impounded)*, 138 F.3d at 982. For example, in *In re Grand Jury (Impounded)* the defendant's office was searched and a file containing attorney work-product was seized. *Id.* at 979-80. Shortly after learning of the seizure, the defendant's attorney notified the United States Attorney and asserted protection

under the work-product doctrine. *Id.* The defense was informed that the government had determined the documents were not protected. *Id.* at 980. Although the defendant made several additional requests to the government, he waited for another four months before filing a motion to compel the return of the file. *Id.* at 981. Although the defendant initially made a timely assertion of work-product protection, the court held his subsequent assertions were insufficient once the government informed the defense it would not relinquish the file voluntarily. *Id.* at 981-82. "Judicial enforcement of the privilege was the only remedy that [the defendant] could have obtained which would have foreclosed the United States from further use of the seized file." *Id.* at 982. The court reasoned that a reasonable person seeking to assert the work-product doctrine would not only inform his adversary, but also seek a judicial determination. *Id.*

Requiring assertions of privilege and work product to be made expeditiously serves the goals underlying the attorney-client privilege and work-product doctrine. The doctrine and privilege both work to shield confidences from adversaries. Both promote broader public interests by advancing the proper administration of legal claims. *See Upjohn Co.*, 449 U.S. at 389 (attorney-client privilege supports proper administration of justice); *Hickman*, 329 U.S. at 510 (work-product doctrine supports orderly prosecution and defense of legal claims). The key is that the party seeking protection must treat the document or

-14-

communication as confidential. When a party delays in asserting protection, however, the adverse party is free to continue to use the material, thereby negating its confidential character. *See In re Grand Jury (Impounded)*, 138 F.3d at 982. The government's investigation may irreparably rely on the protected information, thereby tainting the investigation. *Id.* By failing to minimize the damage caused by the breach of confidentiality, the defendant is prohibited from using the privilege or doctrine to prohibit the government's use of the information. *See de la Jara*, 973 F.2d at 750.

Thus, in the case of an involuntary disclosure, the party asserting the work-product doctrine or attorney-client privilege must pursue all reasonable means to preserve the confidentiality of the material. Taking into account the circumstances surrounding the disclosure, we will examine the specificity with which Ary identified the material, whether protection was asserted in a timely fashion, and whether additional steps, such as judicial action, were necessary for protection.

Examining the above factors, we cannot conclude the district court erred. In his communications with the United States Attorney, Ary never identified the contents of the black plastic box as protected under the work-product doctrine or the attorney-client privilege. Further, Ary did not assert protection in a timely fashion. He waited six weeks to assert protection after the Rule 16 discovery meeting. The district court concluded this delay was sufficient to constitute a

waiver. We agree and hold that Ary waived work-product protection and attorney-client privilege.[6]

The district court's decision to proceed without an evidentiary hearing does not alter this result. The district court did conduct a non-evidentiary hearing on the defendant's motion to suppress. R. Vol. 19 at 3-62. At this hearing, the court received the documents contained in the black plastic box and conducted an *in camera* review. *Id.* at 49-51. Ary had a fair opportunity to present relevant facts and arguments and to counter the government's submissions. *See In re Grand Jury Subpoena*, 274 F.3d at 576. Ary argues an evidentiary hearing was required to determine if the government improperly printed copies of protected documents from Ary's computer or copied the files found in the black plastic box. Ary speculates the government reviewed both the computer's electronic files and the black plastic box and therefore knew it was using hard copies of the computer files it agreed were protected. This contention is unsupported by any evidence and fails to account for Ary's failure to inform the government that the contents

---

[6]It is possible Ary waived the privilege before the Rule 16 discovery meeting. On February 13, 2004, more than sixteen months prior to Ary's assertion of attorney-client privilege, the government informed the defendant it had completed its review of the seized material. Although the inventory of seized items provided to Ary included the black plastic box, he never identified it as containing privileged or protected information. After the government informed Ary the review was complete, he was on notice the government did not consider the contents of the black box protected. We need not, however, decide whether protection was waived at this point. Because Ary failed to assert the attorney-client privilege or work-product protection in a timely fashion after the Rule 16 discovery meeting, the district court did not err.

of the black box may contain privileged information.  Once Ary waived protection of the contents of the black plastic box, the government's use of these documents was proper.  Under these circumstances, the district court was not obligated to hold an evidentiary hearing.

**III.    Admissibility of the Cosmosphere's Inventory Records**

Ary argues the district court erred by admitting into evidence the Cosmosphere's computer and paper inventory records.  This court reviews the district court's receipt of evidence for an abuse of discretion.  *United States v. Gwathney*, 465 F.3d 1133, 1140 (10th Cir. 2006).  We are "especially deferential with respect to rulings on the admission of hearsay evidence."  *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1017 (10th Cir. 2004) (quotation omitted).  "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  Hearsay is inadmissible at trial unless it falls into an exception. Fed. R. Evid. 802.

Rule 803(6) of the Federal Rules of Evidence provides an exception to the hearsay rule for business records if they are "kept in the course of regularly conducted business activity, and if it was the regular practice of that business activity to make the . . . record."  The rationale behind this exception is that business records "have a high degree of reliability because businesses have incentives to keep accurate records."  *Gwathney*, 465 F.3d at 1140 (quotation

omitted).  To satisfy Rule 803(6) the inventory records must (1) have been prepared in the normal course of business; (2) have been made at or near the time of the events recorded; (3) be based on the personal knowledge of the entrant or of a person who had a business duty to transmit the information to the entrant; and (4) indicate the sources, methods and circumstances by which the record was made were trustworthy.  *Id*. at 1141.  The proponent of the document must also lay this foundation for its admission.  *United States v. Samaniego*, 187 F.3d 1222, 1224 (10th Cir. 1999).

The inventory records offered by the government are hearsay.  They are out-of-court statements offered by the government for the truth of the matter asserted, namely that either the United States Government or the Cosmosphere owned the items sold by Ary.  The records were nevertheless properly admitted because the government laid the required foundation for their admission under the business records exception.

The government presented the testimony of Stephen Garner, Sharon Olson-Womack, and James Remar who all served as curators at the Cosmosphere.  A Cosmosphere curator is responsible for the museum's collection and maintains the database records.  These witnesses established that the inventory records were prepared in the normal course of business.  Remar provided extensive testimony on the process by which inventory records are created and maintained.  Garner was specifically tasked with ensuring the museum's paper records, which were

-18-

used before the museum switched to a computerized database system, matched the computer database records. He also testified as to the process by which records were made and updated.

Testimony was provided to establish that the records were made at or near the time of the event recorded. Remar testified that the inventory records were created as soon as the Cosmosphere took possession of a new artifact. At times, curators were tasked with updating information, and when that information was acquired, it was entered into the database.

The government further offered evidence to show the curators had a business duty to create the inventory records. Olson-Womack testified it was her job as a curator to generate the inventory records and Remar explained he was responsible for ensuring that the Cosmosphere's inventory was properly tracked and entered into the database.

Rule 803(6) also requires that the source of information or the method by which the records were kept indicate trustworthiness. *Gwathney*, 465 F.3d at 1141. Although Ary attempts to portray the inventory records as untrustworthy, the record does not support his assertions. Ary points to testimony in which former curators testified about updating the database and their attempts to make it more complete. Although several witnesses testified that the computer database was not 100% complete, no testimony suggested the completed records were

inaccurate as to ownership. The government, therefore, met the four elements of the business records exception.

Ary also argues the records constitute double hearsay. *See* Fed. R. Evid. 805. "Double hearsay in the context of a business record exists when the record is prepared by an employee with information supplied by another person." *Gwathney*, 465 F.3d at 1141 (quotation omitted). If information is provided by another person who is an outsider to the business preparing the record, those statements must also fall within a hearsay exception to be admissible. *Id*; *see also* Fed. R. Evid. 805 ("Hearsay included within hearsay is not excluded . . . if each part of the combined statement conforms with an exception to the hearsay rule . . . .") "The essential component of the business records exception is that each actor in the chain of information is under a business duty or compulsion to provide accurate information." *United States v. McIntyre*, 997 F.2d 687, 699 (10th Cir. 1993). "If any person in the process is not acting in the regular course of business, then an essential link in the trustworthiness chain fails . . . ." *2 McCormick on Evidence* §290 (Kenneth S. Broun, ed., 6th ed. 2006); *McIntyre*, 997 F.2d at 699 (quoting *McCormick* with approval).

Specifically, Ary points to Garner's testimony in which he stated "[i]f a record lacked information, we went to research that and then added that back to those records." Garner further testified this process sometimes required him to track down invoices and documentation that came with the artifact when it was

purchased.  Although Garner relied on outside sources to update the records, those sources were also under a business duty indicating reliability.  One who provides a sales invoice is under a business duty to provide accurate information. *See United States v. Hines*, 564 F.2d 925, 928 (10th Cir. 1977) (holding vehicle invoice admissible under business records exception).  Therefore no link in the trustworthiness chain was broken.  Both the records created by the curators, and the documents upon which they relied, fall into the business records exception to the hearsay rule.  The district court, therefore, did not abuse its discretion in admitting the Cosmosphere's database records.

## IV.    Amount of Loss

A district court's loss calculation at sentencing is a factual question we review for clear error. *United States v. Leach*, 417 F.3d 1099, 1105 n.8 (10th Cir. 2005).  The district court's factual findings constitute clear error when our review of the entire record leaves us with the "definite and firm conclusion that a mistake has been made." *United States v. Burridge*, 191 F.3d 1297, 1301 (10th Cir. 1999) (quotation omitted).  In reviewing the district court's application of the Guidelines, legal determinations are reviewed de novo. *Leach*, 417 F.3d at 1105. At sentencing, the district court may rely on facts stated in the PSR unless the defendant files an objection. *United States v. Wilken*, 498 F.3d 1160, 1169 (10th Cir. 2007). When a defendant objects, the government must prove that fact at the sentencing hearing by a preponderance of the evidence. *Id*.

Amount of loss is defined as the greater of "actual loss" or "intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). Actual loss includes "the reasonable foreseeable pecuniary harm that resulted from the offense," and intended loss "(I) means the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur." *Id.* § 2B1.1 cmt. n.3(A)(i)-(ii). "The court need only make a reasonable estimate of the loss." *Id*. § 2B1.1 cmt. n.3(C).

Ary objected to the district court's calculation of loss based on issues of valuation and ownership. The district court overruled Ary's objections.

## A.     Issue of Valuation

In calculating the amount of loss, the PSR included the items recovered from Ary's home and artifacts his attorney delivered to the government.[7] The U.S. Probation Office examined the available evidence and only included items for which the government could show how the government or the Cosmosphere acquired the artifact. The probation officer assigned each item an "auction price" with a cumulative value of $88,947. Ary objected to the valuation of these items as speculative, impracticable to determine and inadequate to measure the harm.

---

[7]Ary suggests the items included in this loss calculation were only the contents of the three boxes he delivered to his attorney and subsequently turned over to the government. The PSR, however, also took into account the items recovered from Ary's home pursuant to the search warrant.

The government introduced at trial not only acquisition records but also auction catalogues, which included estimated prices certain items would fetch at auction. In many cases, the auction value of an item was far greater than the price at which the Cosmosphere obtained the artifact. The Guidelines state the estimate of amount of loss should be based on available information, taking into account factors such as "[t]he fair market value of the property unlawfully taken . . . ." U.S.S.G. § 2B1.1 cmt. n.3(C)(i). The use of "auction value" was appropriate as a measure of fair market value. The record demonstrates the auction value of the items seized at Ary's house and those turned over to the government exceeded $88,947. Ary's objection to the use of auction value is therefore without merit.

**B.    Issue of Ownership**

Ary argues the district court erred by including in the calculation of loss nineteen artifacts Ary sold at auction from his personal account. Although he concedes there was sufficient evidence to prove loss as to many of the items listed in the PSR, he argues the government offered no proof of ownership either at trial or at the sentencing hearing as to these nineteen artifacts. These artifacts can be organized into two groups. The first group includes fifteen items. All but two of these artifacts were entered into the Cosmosphere database and were sold at

auction under Ary's personal account.[8]  The second group of items were also sold

at auction from Ary's personal account.  These included an Astro Maneuvering

Unit ("AMU") Shell, a 70 mm black and white uncut film of Apollo 10, a 70 mm

film of Apollo 16, and a 70 mm film roll uncut Magazine V of Apollo 11.  The

Cosmosphere, however, never entered the items into their inventory.

The government met its burden of proving ownership by a preponderance

of the evidence as to the fifteen artifacts in the first group.[9]  At the sentencing

hearing, Michael Mataya, a criminal investigator for the NASA Office of the

Inspector General, testified for the government.  Through Mataya, the government

offered into evidence an Excel spreadsheet detailing items missing from the

Cosmosphere's collection.  Many of the items on the list were not included in the

indictment.  Mataya testified, however, he was comfortable that the information

in the spreadsheet was accurate.  The spreadsheet catalogues information

---

[8]These items include: auxiliary docking probe cable, main hatch pressure
dump assembly vent handle, Apollo 8 16 mm camera mount, Apollo 16
transducer, Apollo 14 explosive cartridge, Skylab 2 window shade, Apollo 13
shim $CO_2$, Apollo 9 flight data file chip, Gemini $CO_2$ pressure tank, two
inventoried sets of food items, two-speed interval timer, a primate couch, Apollo
10 Lucite, and acrylic produced from Jim Lovell's couch.  Two items, the acrylic
produced from Jim Lovell's couch and Apollo 10 Lucite, were never entered into
the inventory, but were produced at the Cosmosphere.

[9]The government's brief is less than helpful in analyzing the pertinent
evidence.  At times, the government cites to page ranges up to 600 pages in the
record.  We strongly disapprove of this practice.  10th Cir. R. 28.1 requires the
government to cite to the place in the record where evidence can be found.  A
600-page range does not satisfy this requirement.

including the Cosmosphere inventory numbers assigned to the artifacts, the dates the items were acquired, the methods of acquisition, and information as to the last known status for the missing artifacts. Thirteen of these items were officially entered into the Cosmosphere inventory, proving ownership by either the Cosmosphere itself or a United States Government entity such as NASA. For example, Mataya's spreadsheet shows that food items were acquired by the Cosmosphere in May of 1981. The food items were given a unique Cosmosphere inventory number of 2090. The spreadsheet indicated the items were transferred from the National Air and Space Museum. The food items were subsequently sold by Ary at the Superior Auction in 2000 from Ary's personal account. The acrylic from Jim Lovell's couch and the Apollo 10 Lucite do not have inventory numbers. Evidence in the record, however, indicates these items were produced by the Cosmosphere. Thus, ownership can be inferred and their inclusion in the loss calculation was not clear error.

Proof of ownership for the second group of items, however, is not supported by similar evidence. The AMU Shell sold by Ary did not appear in the Cosmosphere's inventory database and information on the date or method of acquisition is not in the record. Standing alone, the lack of an inventory number or documentation would not necessarily defeat a claim of ownership. The government contends that the Cosmosphere received an AMU Unit from NASA and ownership can therefore be inferred. There is no particularized evidence,

however, to connect the AMU Shell sold by Ary with the AMU Unit transferred to the Cosmosphere.[10]  The AMU Shell was valued at $800.  This amount must be deducted from the amount of loss calculation.

The three 70 mm films in the second grouping were acquired from NASA but never entered into the Cosmosphere's inventory.  At the sentencing hearing, evidence was introduced that NASA had no official protocol by which these films would be given to individuals; instead, NASA policy was to give them to institutions.  Mataya testified that although he had never seen any documentary evidence suggesting the films belonged to NASA or the Cosmosphere, museum staff believed these items were part of their collection based on recollections of seeing the films in boxes at the museum.

Importantly, the district court determined there was insufficient evidence of ownership to award restitution on the films.  It therefore reduced the total amount of restitution by the value of the six films at issue at that hearing.[11]  District courts are to make factual findings at restitution hearings by the preponderance of

_____

[10]If an AMU Shell is particularly unique it could be possible to conclude the Cosmosphere owned this item.  The government, however, makes no such argument.

[11]These items included a 70mm film role uncut Magazine V Apollo 11; a film roll Magazine S Apollo 12; a film roll Magazine S Apollo 11; a 70 mm film of Apollo 16; a 16 mm DAC Film Magazine; and a 70 mm black and white uncut film Apollo 10.

the evidence. 18 U.S.C. § 3664(e).[12] Because the government could not prove by a preponderance of evidence that Ary stole the films, they cannot be used to calculate the amount of loss. *See United States v. Schild*, 269 F.3d 1198, 1200 (10th Cir. 2001).

Although the district court found insufficient evidence to establish ownership of six films, three were included in the PSR's calculation of loss. The Apollo 10 black and white film was valued at $2,500, the Apollo 11 film was valued at $8,750, and the Apollo 16 film was valued at $25,000. A total of $36,250, therefore, must be deducted from the loss calculation.

The district court concluded the probation officer had appropriately calculated the amount of loss for the purposes of sentencing. As a result, the district court stated "I am finding that the 12-level enhancement is appropriate; that the amount of loss does fall somewhere between $200[,000] and $400,000, and as a result of that the offense level is correctly calculated."[13] R. Vol. 19 at 158. The PSR lists numerous items and the dollar value associated with the loss.

---

[12]The government seems to suggest this court can reconcile the contradiction between the sentencing hearing and the restitution hearing based on burden of proof standards. Despite the government's assertions, without citation, the burden of proof at a restitution hearing is the same as at a sentencing hearing—preponderance of the evidence.

[13]The district court need not find amount of loss with precision. A court therefore does not err by finding loss within a range, so long as that range is supported by the evidence. *United States v. Galloway*, 509 F.3d 1246, 1252 (10th Cir. 2007).

It does not, however, total these values but instead concludes the loss is "greater than $200,000." The parties interpret this finding differently. The government contends the PSR's loss calculation totals $268,074. Ary, on the other hand, submits that the elements of loss totals $238,092. We need not resolve this dispute. Subtracting the value of the three film items improperly included in the PSR and the AMU Shell from Ary's figure of $238,092, the amount of loss remains greater than $200,000. Therefore, the district court's error in calculating the amount of loss was harmless.

## V.    Conclusion

For the foregoing reasons, Ary's conviction and sentence are **affirmed**.