FILED
United States Court of Appeals
Tenth Circuit

November 29, 2012

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DENIECE SANCHEZ,

Defendant - Appellant.

No. 12-2088

(D. New Mexico)

(D.C. No. 2:10-CR-02855-JAP-1)

**ORDER AND JUDGMENT**[*]

Before **MURPHY**, **ANDERSON**, and **HARTZ**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined

unanimously that oral argument would not materially assist in the determination

of this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is

therefore ordered submitted without oral argument.

Defendant and appellant, Deniece Sanchez, pled guilty to one count of

conspiring to launder money instruments, in violation of 18 U.S.C. § 1956(h).

She was ultimately sentenced to imprisonment for one year and one day, followed

_____

[*]This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 32.1.

by three years of supervised release. She was also ordered to make restitution to Farmers Insurance Group in the amount of $144,494.27. Arguing her sentence is procedurally and substantively unreasonable, she appeals that sentence, which we affirm.

## BACKGROUND

During the time relevant to these proceedings, Ms. Sanchez was married to Joseph Montes.[1] Mr. Montes was a claims supervisor with Farmers Insurance Group and worked out of the house he shared with Ms. Sanchez in Las Cruces, New Mexico. Farmers had provided Mr. Montes with a computer which he used in his job as a claims supervisor. As a claims supervisor, Mr. Montes supervised several Farmers claims representatives ("CR"s), who also worked out of their homes. Ms. Sanchez owned and controlled a construction company, Beyond Construction, which was based in New Mexico. She also owned and controlled a New Mexico company called Rustic Imports.

Because the only dispute in this appeal is whether the district court correctly calculated the amount of loss attributable to Ms. Sanchez's money-laundering conduct, and she does not dispute her conviction, we merely summarize the facts relating to the offense of conviction. Briefly, Farmers

---

[1]Mr. Montes was convicted of the same offense as Ms. Sanchez and was also sentenced to a year and a day. He has not appealed his conviction or sentence. Mr. Montes and Ms. Sanchez are now divorced.

discovered, in 2009, that Mr. Montes was fraudulently submitting insurance claims through the Farmers Insurance Customer Restoration Network, using the log-in information of five CRs (whom he supervised). A total of thirty-seven checks were found to be fraudulently submitted by Mr. Montes. Those checks were made payable to Beyond Construction, Paul Davis Restoration (subsequently endorsed over to Beyond Construction) and, in one case, to Rustic Imports. Paul Davis Restoration was a legitimate, damage mitigation, reconstruction and remodeling company, with locations throughout Texas, except for El Paso. Paul Davis had no connection to Ms. Sanchez or Mr. Montes.

An investigation of Ms. Sanchez's and Mr. Montes' bank records revealed that the fraudulently obtained Farmers claim checks were deposited into the Beyond Construction bank account and then transferred out by Ms. Sanchez and/or Mr. Montes through checks made payable to Mr. Montes, to Ms. Sanchez or to cash. They were then deposited into a joint personal account belonging to the two. The two then used the money for personal expenses, including travel and housing. The transfer of money from Beyond Construction's business account gave the funds the appearance of legitimately earned income from Beyond Construction being passed to the personal accounts of Ms. Sanchez and Mr. Montes. Farmers eventually contacted the Federal Bureau of Investigation ("FBI"), which conducted a full investigation. The total amount reflected in the fraudulent checks was $150,437.64.

On August 19, 2009, Ms. Sanchez closed the Beyond Construction account, withdrawing the entire remaining balance of $21,241.28. She used that balance to open a new account at Pioneer Bank in Las Cruces. Mr. Montes resigned from Farmers on October 6, 2009. They were both arrested on July 13, 2010. Ms. Sanchez pled guilty on October 14, 2010.

In preparation for sentencing under the United States Sentencing Commission, Guidelines Manual ("USSG"), the United States Probation Office prepared a presentence report ("PSR"). The PSR determined the base offense level was 16. This was calculated by means of the base offense level of 6 for money laundering (see USSG § 2B1.1), to which 10 additional levels were added because the amount of loss exceeded $120,000. USSG §2S1.1(a)(1). Two additional levels were added pursuant to USSG § 2S1.1(b)(2)(B) because Ms. Sanchez was convicted of violating 18 U.S.C. § 1956. After deductions for acceptance of responsibility, the PSR calculated a total offense level of 15. When combined with a criminal history category of I, the advisory sentencing range was eighteen to twenty-four months.

Ms. Sanchez filed objections to the PSR and requested a downward departure or a departure pursuant to United States v. Booker, 543 U.S. 220 (2005), which determined that the Sentencing Guidelines are advisory only. She argued that, while she admitted to engaging in unlawful conduct in 2008 and 2009, she did not do anything unlawful in 2007. Thus, she contended that in 2007

she was living in Santa Fe and that her company, Beyond Construction, was actively engaged in legitimate construction work. She therefore claimed that the PSR wrongly attributed to her, as part of its loss calculation, monies received by Beyond Construction in 2007. Ms. Sanchez averred that the actual loss to Farmers was $117,393.03, which would have the effect of reducing her base offense level in the PSR from 16 to 14.

Ms. Sanchez also claimed that the PSR failed to reflect the correct nature of her participation in the crime. More specifically, she claimed that her total offense level should be reduced by two to four levels pursuant to USSG §3B1.2 because she was "less culpable" than an intentional or sophisticated money launderer. Ms. Sanchez alleged that the scheme to defraud Farmers was not sophisticated, and that she did not know how Mr. Montes had procured the fraudulent checks. Thus, she averred her total offense level should have been 11, which would result in an advisory guideline range of eight to fourteen months.

Finally, she sought a downward variance, arguing that the "offense in this case represents a marked deviation by defendant from an otherwise law-abiding life." Objections to PSR & Request for Variance at 8, R. Vol. 1 at 30.

The government filed a sentencing memorandum, in which it responded to Ms. Sanchez's objections. The government noted that Ms. Sanchez had taken the lead in "laundering the stolen money through her business's bank account to give the funds the appearance of legitimate business income, thereby perpetuating the

fraud and the lifestyle it afforded." Sent. Mem. at 1, R. Vol. 1 at 53. The government further pointed out that, rather than being a momentary lapse of judgment by Ms. Sanchez, she engaged in calculated dishonesty over a period of two years, and was motivated by "greed, avarice, and vanity." Id. The government thus argued that Ms. Sanchez should receive a sentence of at least twenty-four months, at the top of the appropriate advisory guideline range.

The government further argued that the correct amount of loss attributable to Ms. Sanchez was $144,494.27. It agreed that six checks issued to Beyond Construction in 2007 (totaling $1,076.01) and a cashier's check in the amount of $4,867.36 should not be included in the loss calculation. This reduced the loss amount reflected in the PSR by $5,943.37. But because the loss amount remained above $120,000, the government argued that the PSR correctly determined the total offense level to be 16. Thus, because Ms. Sanchez continued to argue that all work done in 2007 should be excluded from the loss calculation, two checks remained in dispute: a check for $14,508.83 (the "$14,000 check") issued to Beyond Construction on May 3, 2007, and a check for $12,592.71 (the "$12,000 check") issued to Rustic Imports on May 18, 2007.

With respect to these two checks, Ms. Sanchez argued that they, along with all other checks paid to Beyond Construction in 2007, were for legitimate work. The government argued they were part of the fraud scheme, and that she admitted

as much in statements she made when pleading guilty,[2] statements she made to federal agents, and statements she made to the probation officer when she was seeking an acceptance-of-responsibility adjustment.[3] Rather, the government claimed it was an "eleventh-hour" attempt to reduce the advisory sentencing guideline range once she understood the significance of the $120,000 loss amount.

The government also refuted Ms. Sanchez's argument that she was entitled to a downward adjustment because she played a "less culpable" role in the crime. It alleged that Ms. Sanchez and Mr. Montes were equally culpable and that each had played an essential role in the conspiracy. Furthermore, the government argued that a sentence at the high end of the advisory guideline range was necessary to achieve the sentencing objectives of 18 U.S.C. § 3553(a).

The district court held an evidentiary hearing to determine the correct amount of loss. The only disputed issue was whether the $14,000 check and the $12,000 check issued in 2007 were part of the money laundering scheme and

---

[2]At the hearing in which she pled guilty, Ms. Sanchez admitted as true the government's assertion that the fraudulent scheme occurred "between . . . March 9th, 2007 [and] August . . . 19th, 2009." Tr. of Plea Hr'g at 10-12, R. Vol. 1 at 42-44.

[3]In seeking an acceptance-of-responsibility downward adjustment, Ms. Sanchez submitted a written statement in which she admitted the conspiracy began "[i]n 2007." PSR at ¶ 22, R. Vol. 2 at 10. She later disputed that statement.

therefore properly included in the amount of loss. Because this is the central issue on appeal, we describe in some detail the evidence presented at the hearing.

The government presented evidence from three witnesses. The field claims manager for Farmers, Jason Lacy, testified about the claim of a Farmers insured named Claudina Trevino, whose home had sustained water damage. Farmers records showed that the assigned claims adjustor arranged for Farmers to issue three checks totaling $17,705.14. The disputed $14,000 check was the fourth check issued on this account. As indicated above, this check was payable to Beyond Construction.

Mr. Lacy testified that several things were unusual about the $14,000 check. First, it was issued after Ms. Trevino's claim had been closed down. The claims file contained no record of why the check was issued and it contained none of the documentation required by Farmers' internal protocol or procedures. Mr. Lacy testified that for all claims exceeding $5,000, Farmers added the name of the insured's mortgage company as an additional payee. With respect to the three initial checks Ms. Trevino received, she was listed as the payee on the first check (for $2,306.04); both she and Countrywide Home Loan were listed as payees on the second and third checks (for $7,793.46 and $7,605.14, respectively). But on the $14,000 check, only Beyond Construction was listed as a payee. Additionally, the claims file showed that no required supervisory level approval was given for the $14,000 check; rather, it had been issued based solely on Mr. Montes'

approval.  Mr. Lacy testified that the first three checks to Ms. Trevino were legitimate, whereas the $14,000 check was not.

With respect to the $12,000 check, which had a different claim number from the Trevino job, Mr. Lacy testified that the named payee was Rustic Imports, and that the check was "completely against [Farmers'] indemnity protocols[.]" Evid. Hr'g at 13, R.  Vol. 1 at 100.  No Farmers insured was named as a payee; it was "well outside our bounds for what needed to be done." Id. at 14.  And it was issued directly to a vendor, which was against Farmer's normal practice.  It did, however, presumably by virtue of its claim number, relate to a Farmers insured other than Ms. Trevino. Id. at 124.

Further testimony revealed that in 2009, Susan Barnett, a senior auditor for Farmers, conducted an audit of Mr. Montes and checks issued to Beyond Construction.  This audit revealed the financial fraud scheme at issue in this case.  The audit showed that Mr. Montes opened closed claims files, issued checks to Beyond Construction and others, and then closed the files.  This audit did not, however, uncover the $14,000 check or the $12,000 deck.

Finally, the government called FBI Special Agent Ida D'Antonio to testify.  She stated that she had participated in a full financial investigation of Mr. Montes and Ms. Sanchez.  In the course of that investigation, the FBI subpoenaed Ms. Sanchez's bank account records at Century Bank.  A search of those records disclosed the $14,000 check to Beyond Construction and the $12,000 check to

Rustic Imports. Agent D'Antonio informed Farmers of her findings. After reviewing the records and discussing the matter with Farmers personnel, the agent concluded that the two disputed checks were a part of the fraudulent scheme involving Mr. Montes and Ms. Sanchez.

Agent D'Antonio also testified that she had interviewed Ms. Trevino prior to the evidentiary hearing. Ms. Trevino prepared a written statement based on this interview, which was read to the court at the evidentiary hearing. Ms. Trevino's statement revealed that she had been under stress in 2007 because her husband was dying. She said that, following the water damage to her home, she filed a claim with Farmers and Farmers paid her $8,852. She requested that Farmers send out a company to make the required repairs. Ms. Sanchez came to Ms. Trevino's home, representing Beyond Construction, and prepared an estimate on behalf of her company. The company address on the estimate was Ms. Sanchez's home in Santa Fe. The estimate stated the total price of repairs was $17,705.14; Ms. Trevino apparently wrote a check to Beyond Construction in the amount of $8,852.00 as a 50% deposit. At some point, Farmers reimbursed Ms. Trevino for that amount. Ultimately, Farmers made four payments on the Trevino claim, totaling some $32,000. As indicated above, the $14,000 check was attributed to the Trevino claim, although it was paid directly to Beyond Construction. The $12,000 check, while issued to Rustic Imports during the same time period, had a different claim number than the Trevino claim.

Ms. Sanchez also presented evidence at the evidentiary hearing, including her own testimony. She stated that she had obtained her construction license in 2006 and had begun operating a business under the name Beyond Construction. She further testified that Rustic Imports was a furniture store in Santa Fe that built cabinets for Home Depot.

Ms. Sanchez indicated that she became reacquainted with Mr. Montes in 2006. At that time, he worked for Farmers. Ms. Sanchez stated that she had done no work for Farmers before she began her relationship with Mr. Montes, and that the job for Ms. Trevino was the only job she did for Farmers. Ms. Sanchez stated she was sent by Farmers to Ms. Trevino's house to prepare an estimate. Ms. Trevino paid her half the estimate ($8,852.57), and Ms. Sanchez deposited Ms. Trevino's check in the Beyond Construction account. Ms. Sanchez testified that she received the $14,000 check and the $12,000 check from Farmers, and the $12,000 check was made payable to Rustic Imports for upgraded cabinets which Ms. Trevino wanted.

Ms. Sanchez further stated that, after she began the work, she told Ms. Trevino that the job was going to cost more than anticipated. She said she prepared a new invoice which reflected the unpaid half of the original estimate and the added costs. Ms. Sanchez testified that she did not have a copy of any records relating to the Trevino job because they had all been either confiscated by law enforcement personnel or destroyed by Mr. Montes. She further testified

that, while she had received three checks for the Trevino job (the $8,852 check from Ms. Trevino and the $14,000 and $12,000 checks from Farmers), she did not know that the $12,000 check had a claim number different from the claim number for the Trevino job and did not know that Farmers' protocol had not been followed with respect to the latter two checks.

Furthermore, Ms. Sanchez claimed to be unaware that Mr. Montes was doing anything inappropriate with her estimates in 2007. Ms. Sanchez admitted that she did not earn the money she received from Farmers in 2008 and 2009, but that she did earn it in 2007: "In 2007, I earned it. In 2008 to 2009, I did not." Id. at 147.

In rebuttal, the government re-called FBI Special Agent D'Antonio. She testified that Ms. Sanchez had told her that Mr. Montes accompanied her to jobs in 2007 and that he always told her to prepare high estimates and to keep what was left over after the jobs were completed. Ms. Sanchez also told Agent D'Antonio that the $14,000 check was for the first estimate on the Trevino job and that the $12,000 check was for "upgraded" cabinets, but that she and Mr. Montes knew that it was $6,000 more than the actual cost of the cabinets and that Mr. Montes told Ms. Sanchez to keep the rest of the money.

The government also re-called Farmers agent Mr. Lacy. He testified that Farmers would "not under any circumstances upgrade [an insured's] cabinets." Id. at 200.

Following the evidentiary hearing, the court directed the parties to brief the issue of whether the record demonstrated by a preponderance of the evidence that Ms. Sanchez's offense involved loss exceeding $120,000 (triggering USSG §2B1.1(b)(1)(F)'s 10-level increase in the offense level). Ms. Sanchez reiterated her argument for a reduced sentence, claiming that the $14,000 and $12,000 checks were not properly included in the amount of loss. The government's brief argued, again, that Farmers' loss was at least $144,494.27 and it reiterated, and explained with reference to the record, that the $14,000 and $12,000 checks were properly included in the loss figure. The government at that time sought a forty-one month sentence for Ms. Sanchez.

At the sentencing hearing on May 15, 2012, the district court found that the government had proven, by a preponderance of the evidence, that both the $12,000 check and the $14,000 check had been obtained fraudulently by Ms. Sanchez and Mr. Montes. It also found that the amount of loss to Farmers was $144,492.27. Although it denied the government's request for an obstruction of justice enhancement of Ms. Sanchez's offense level, based upon her claimed untruthful testimony at the evidentiary hearing, the district court did state that it found "Ms. Sanchez' testimony to be bizarre in the sense that I thought she was somewhat in a dream world. I couldn't quite conclude that she was consciously lying on the stand. It seemed very strange." Tr. of Sentencing Hr'g at 11, R. Vol. 3 at 11. The district court ultimately concluded that Ms. Sanchez's total

offense level was 16, which, with a criminal history category of I, yielded an advisory guideline sentencing range of twenty-one to twenty-seven months.

The court then imposed a sentence of twelve months and one day, finding that sentence "sufficient but not greater than necessary to comply with the purposes of [18 U.S.C. § 3553(a)]" and that it was "the same sentence that was imposed on the codefendant." Id. at 15-16. The court further observed that the offense was a serious one and was "a long, ongoing fraudulent scheme between Mr. Montes and this defendant." Id. at 16. And while Ms. Sanchez had no criminal history, the crime was "disgusting and long-ranging" although "it did not involve weapons or violence." Id. The district court noted that Ms. Sanchez was a single mother who had raised an "outstanding daughter" with the prospect of attending college. Id. at 16-17. And while the court stated that it did not believe much of Ms. Sanchez's testimony at the evidentiary hearing, the court "didn't have the sense that she was a sophisticated liar. It just seemed that she was in a dream world, not understanding the consequences of her conduct." Id. at 17.

Finally, the court noted that the sentence was "a significant departure from the bottom of the guideline range of 21 months down to 12 months and one day, but I don't think it's such a significant departure that it violates 3553(b), which requires consideration of application of the guidelines." Id. at 18.

Ms. Sanchez appeals her sentence, arguing it is procedurally and substantively unreasonable.

## DISCUSSION

We review a federal sentence for reasonableness, using a deferential abuse of discretion standard. United States v. Smart, 518 F.3d 800, 806 (10th Cir. 2008). Our reasonableness review "includes both a procedural component, encompassing the method by which a sentence was calculated, as well as a substantive component, which relates to the length of the resulting sentence." Id. at 803. A challenge to a sentence's procedural reasonableness includes not only whether the district court properly calculated the sentence under the Guidelines, but whether it treated the Guidelines as mandatory, failed to consider the 3553(a) factors, selected a sentence based on clearly erroneous facts, or failed to adequately explain the chosen sentence. See United States v. Sayad, 589 F.3d 1110, 1116 (10th Cir. 2009). In considering the district court's application of the Guidelines, we review factual findings for clear error and legal determinations *de novo*. See United States v. Kristl, 437 F.3d 1050, 1054 (10th Cir. 2006).

Substantive reasonableness review, in turn, involves "whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in § 3553(a)." Sayad, 589 F.3d at 1116 (internal quotation marks omitted). In reviewing a district court's sentence for substantive reasonableness under the § 3553(a) factors, we give substantial deference to the district court. Id. This level of deference is appropriate because the district court has an unquestionable institutional advantage, involving greater familiarity with

individual cases and defendants, to consider whether the facts of the case justify a variance under § 3553(a).  See id.; United States v. Rita, 551 U.S. 338, 350 (2007).  Accordingly, we have held that a district court's sentence is substantively reasonable only if it is not arbitrary, capricious, whimsical, or manifestly unreasonable.  See Sayad, 589 F.3d at 1116.

Ms. Sanchez argues her sentence is procedurally unreasonable because the district court erred in calculating the amount of loss, with the result that her offense level was incorrect.  She argues her sentence is substantively unreasonable because the court failed to consider her lesser role in the crime, compared to Mr. Montes.  We consider procedural reasonableness first.

"A district court's loss calculation at sentencing is a factual question we review for clear error."  United States v. Griffith, 584 F.3d 1004, 1011 (10th Cir. 2009) (quoting United States v. Ary, 518 F.3d 775, 787 (10th Cir. 2008)).  "Reversing for clear error 'requires that, based on the entire evidence, we have a definite and firm conviction that a mistake has been committed.'"  Id. (quoting United States v. Hahn, 551 F.3d 977, 979 (10th Cir. 2008) (further quotation omitted)).  Finally, "the government bears the burden of proving loss by a preponderance of the evidence."  Id.

We conclude that Ms. Sanchez has not established clear error in the district court's finding that the amount of loss exceeded $120,000.  As the above factual recitation indicates, there was sufficient evidence that the $12,000 check and the

$14,000 check were irregular and were issued in connection with a job that also appeared to be handled unusually, at a minimum, in terms of Farmers' standard practices. Furthermore, they were consistent with other checks which Ms. Sanchez admitted were fraudulent. We are not convinced that the district court clearly erred in its calculation of the amount of loss. Ms. Sanchez's sentence is therefore not procedurally unreasonable.

With respect to the substantive reasonableness of the sentence, Ms. Sanchez's basic argument is that, in departing downward from the advisory Guidelines sentence, the district court failed to consider, and the sentence accordingly failed to reflect, her allegedly lesser role in the fraudulent scheme. We reject that argument. As the district court observed, she and Mr. Montes were equally involved in, and crucial to the success of, the enterprise. While Mr. Montes generated the fraudulent checks, Ms. Sanchez "received" and deposited the checks into her company's bank account. Without her involvement, the conspiracy would have failed. In short, we cannot discern any lesser degree of culpability on Ms. Sanchez's part. Her sentence is accordingly substantively reasonable.

We have carefully reviewed the record and the parties' arguments, and they reveal no other basis on which to challenge the reasonableness of Ms. Sanchez's sentence.

-17-

## CONCLUSION

For the foregoing reasons, we AFFIRM the sentence in this case. Ms.

Sanchez's pending motion for release is denied as moot.

ENTERED FOR THE COURT


Stephen H. Anderson
Circuit Judge